RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0145p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

LISA PRICE, Personal Representative of the Estate of
Nickie Miller,

               *Plaintiff - Appellant*,

    *v.*

MONTGOMERY COUNTY, KENTUCKY, et al.,

               *Defendants-Appellees*.

> No. 21-6076

_____

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:18-cv-00619—Danny C. Reeves, Chief District Judge.

Argued: October 27, 2022

Decided and Filed: July 5, 2023

Before: SILER, NALBANDIAN, and READLER, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Debra Loevy, LOEVY & LOEVY, Chicago, Illinois, for Appellant. Lynn Sowards Zellen, KINKEAD & STILZ, PLLC, Lexington, Kentucky, for Appellees Montgomery County, Fred Shortridge, Ralph Charles, Jr., Mark Collier, and Eric Jones. Michael R. Wajda, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee Keith Craycraft. Brenn O. Combs, KENTUCKY STATE POLICE, Frankfort, Kentucky, for Appellee John Fyffe. **ON BRIEF:** Debra Loevy, Elliot Slosar, Amy Robinson Staples, Margaret E. Campbell, LOEVY & LOEVY, Chicago, Illinois, for Appellant. Lynn Sowards Zellen, D. Barry Stilz, KINKEAD & STILZ, PLLC, Lexington, Kentucky, for Appellees Montgomery County, Fred Shortridge, Ralph Charles, Jr., Mark Collier, and Eric Jones. Michael R. Wajda, Matthew F. Kuhn, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee Keith Craycraft. Brenn O. Combs, KENTUCKY STATE POLICE, Frankfort, Kentucky, for Appellee John Fyffe.

    READLER, J., delivered the opinion of the court in which SILER, J., joined. NALBANDIAN, J. (pp. 18–30), delivered a separate opinion concurring in part and in the judgment.

---

**OPINION**

---

CHAD A. READLER, Circuit Judge. Paul Brewer was found blindfolded and tied to his bed with two bullet holes in him. Brewer's death went unexplained for years, until Natasha Martin confessed to being part of a scheme to rob Brewer in his home. According to Martin, Nickie Miller and others killed Brewer after Martin left the scene. But Martin would later recant and re-confess, and would do so more than once. Despite the back and forth, Miller was arrested and charged with murder based primarily on Martin's confession.

Miller believed that Martin's shifting story was the product of official misconduct. So he brought this action under 42 U.S.C. § 1983 against the prosecutor, polygrapher, and investigating officers, as well as Montgomery County. While couched under the umbrella of numerous causes of action, the crux of Miller's argument is that he was illegally detained without nonfabricated probable cause. The district court granted a mix of absolute and qualified immunity to defendants. We agree and affirm.

I.

The facts tell a tale worthy of the silver screen. Upon arriving at Paul Brewer's home to conduct a welfare check, Montgomery County officers discovered Brewer was deceased. Detective Sergeant Ralph Charles was called to the scene. When he arrived, he found Brewer's naked body tied to his bed frame and sprawled out in a pool of blood. A twice-punctured pillow was laid atop Brewer's head. Men's underwear and black fishnet stockings lay on the floor beside him. After removing the pillow, Charles discovered that Brewer was blindfolded, and that he had been shot twice by a .45 caliber revolver.

Charles began investigating Brewer's death. He first contacted Brewer's daughter. She told Charles that Brewer was having a threesome that night and that she believed Brewer's girlfriend was responsible for the murder. But other people Charles contacted believed the culprit was someone else, offering their own theories of the crime. In the end, the investigation made little progress.

The case went cold for nearly four years. Then, Kennie Helton, an inmate in a local prison, reached out to Charles, indicating she had information about Brewer's murder. Charles had spoken to Helton during his initial investigation. The story she told Charles this time was markedly different than the one she told years earlier. Now, she claimed that three men—including Nickie Miller and Cody Hall—and two women were responsible for Brewer's death. According to Helton, the men had the two women set up a threesome with Brewer in an effort to rob him. The DNA found at the scene, however, did not implicate either of the women Helton identified.

Nonetheless, Charles interviewed the two women. The story they told Charles implicated Natasha Martin in the purported *ménage à trois*. Charles knew the story he had just heard was false. Yet he, along with Montgomery County Sheriff Fred Shortridge and Deputy Mark Collier, acted on the lead anyway and interviewed Martin in late 2015. Contrary to Sheriff's Office policy, the interview was not recorded. During the interview, Martin waffled between denying any involvement in the murder and equivocating on the issue. She first provided an impossible alibi. Later, officers told her that her DNA was found at the crime scene; in truth, the DNA testing results were inconclusive and merely failed to exclude Martin. Next, they confronted Martin with information from other witnesses. Martin eventually backtracked, saying that, if she had been with Hall and Miller that night and "something happened," she "really didn't know it was going to happen."

After the interview, Charles brought Martin to take a polygraph examination with John Fyffe of the Kentucky State Police. Charles and Collier gave Fyffe some general background information as well as their theory of the case, including potential suspects. Fyffe began his pre-examination interview by asking Martin some personal questions. In so doing, he told Martin (without knowing if the information was public) some of the facts relayed to him by Charles and Collier. Namely, Fyffe noted that the murder occurred on Natalie Drive in Mount Sterling, Kentucky, detectives believed two women tied Brewer to his bed before Hall and another man killed him, and Martin's DNA was found on one of the wrist restraints used to tie down Brewer. He then conducted the examination. When he finished, he told Martin and Charles the results: Martin failed. Yet Martin continued to deny involvement.

Fyffe changed his approach. He turned to seeking Martin's cooperation by minimizing her role, telling her that this was a "robbery gone bad" and that they only wanted the trigger man, not her. More to the point, Fyffe went beyond implication in telling Martin that "she'[d] walk" if she told the officers who killed Brewer, despite lacking the authority to make such a decision and not knowing if it was true. And the flip side: if she did not implicate anybody else, Fyffe told her, she would "go down by herself." Martin asked to speak with Charles. He told Martin that she needed to clear her conscience and think of her children, who Fyffe implied could be taken away if she remained a suspect rather than a witness. At this point, Martin asked for a lawyer, but she continued to answer questions without one.

Charles and Collier eventually took Martin back to Shortridge's office, where they again interrogated her until she once more asked for a lawyer. Shortridge contacted attorney James Davis. After speaking privately with Martin for 20 minutes, Davis promptly called the Commonwealth Attorney to work out a deal. They agreed that Martin would get a diversionary deal in exchange for her truthful statement, meaning she would plead guilty, serve no jail time, and no longer be a felon in five years' time.

With the deal struck and her attorney present, Martin continued the interview with Charles, Collier, and Shortridge. Martin explained that her memory was not "100 percent" because she was "very, very high" the night Brewer was killed. R.118-33, PageID# 3018, 3020–21. She was unsure if the other woman there that night was Kennie Helton or Kyla Walters. She did, however, recall tying Brewer to his bed with Velcro straps. She said that she and the other woman radioed to Miller after Brewer was tied down. She heard one gunshot after leaving the house (two bullets were recovered). And, she added, Hall later told her that Miller killed Brewer, and that she was to tell nobody about the robbery.

Martin went home to her grandmother. At this point she broke into tears, knowing the in-station confession was false. The next morning, Martin went to recant her confession. But the officers did not believe her—despite knowing that some of the information she originally provided was incorrect. Martin stepped out to speak with her attorney. When she re-emerged, she took the position that her original confession was accurate. Armed with Martin's confession,

Charles testified before a grand jury and secured indictments against Hall, Miller, and Martin for Brewer's robbery and murder.

Martin would recant her confession yet again. In jailhouse letters, Martin told Hall that her confession was obtained through "coercive interrogation techniques, threats, and undisclosed promises of consideration." Complaint, R.1, PageID# 24, ¶ 156. Hall responded, indicating that they were both innocent of Brewer's murder. Miller's defense team sought and obtained a state court order directing jail personnel to grant them access to these letters. But when they tried to contact Martin, they were told she had been released on bond and was no longer in their custody. Jail personnel contacted Martin, who in turn contacted the prosecutor assigned to take lead on the case, Assistant Commonwealth Attorney Keith Craycraft, to ask about the order. Craycraft told Martin to get rid of the letters rather than turn them over, so she did.

Kentucky eventually dropped its charges against Miller. But that would not be the end of things. Miller filed this § 1983 action for malicious prosecution, fabrication of evidence, destruction of exculpatory evidence, due process violations, conspiracy, and related Kentucky law claims. Named as defendants were Charles, Collier, Craycraft, Fyffe, jailer Eric Jones, Shortridge, and Montgomery County. The district court dismissed Miller's claims against Craycraft on account of his absolute immunity as a prosecutor. The remaining defendants were later awarded summary judgment on the § 1983 claims on the basis of qualified immunity. The state claims, the district court explained, likewise failed because Miller did not raise a genuine issue of material fact, and his claims failed as a matter of law.

Miller timely appealed. But he passed away soon thereafter. His daughter, representing his estate, was substituted for him as plaintiff, and the case has proceeded accordingly. For convenience, we will continue to refer to the plaintiff as Miller.

## II.

Miller's appeal raises one jurisdictional issue. By way of background, the district court had subject matter jurisdiction over this case at the time Miller filed his complaint. Jurisdiction over Miller's constitutional claims was authorized by 28 U.S.C. § 1331, as those claims arose under federal law. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308,

312 (2005). And the court had supplemental jurisdiction over Miller's Kentucky law claims under 28 U.S.C. § 1367, as those claims share a "common nucleus of operative fact" with Miller's constitutional claims. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 165 (1997) (citation omitted).

Miller also properly invoked our jurisdiction, as he appealed from the entry of final judgment in defendants' favor. *See* 28 U.S.C. § 1291. But while his appeal was pending, Miller passed away, at which point his estate was substituted for him as plaintiff. Defendants filed a joint motion to dismiss for lack of jurisdiction. They maintained that Kentucky's survivorship statute, Ky. Rev. Stat. § 411.140, precludes malicious prosecution and related claims following Miller's death. Defendants' argument, however, confuses traditional state law malicious prosecution claims with Fourth Amendment-inspired claims, also referred to as "malicious prosecution." *See Sykes v. Anderson*, 625 F.3d 294, 308–10 (6th Cir. 2010) ("[D]esignating the constitutional claim as one for 'malicious prosecution' is both unfortunate and confusing. A better name that would perhaps grasp the essence of this cause of action under applicable Fourth Amendment principles might be 'unreasonable prosecutorial seizure.'" (quoting *Frantz v. Village of Bradford*, 245 F.3d 869, 881 (6th Cir. 2001) (Gilman, J., dissenting), *abrogated on other grounds by Darrah v. City of Oak Park*, 255 F.3d 301, 311–12 (6th Cir. 2001)); *see also Thompson v. Clark*, 142 S. Ct. 1332, 1337 (2022) (recognizing a Fourth Amendment malicious prosecution claim may be brought for "unreasonable seizure pursuant to legal process")). These latter claims are in effect false arrest claims, arising out of the Fourth Amendment's prohibition on unreasonable seizures. *Sykes*, 625 F.3d at 308–10. And for determining survival of § 1983 claims, we do not break them out individually. *Jackson v. City of Cleveland*, 925 F.3d 793, 811 (6th Cir. 2019). The level of generality at which we view those claims is that of basic personal injury actions, which, under Kentucky law, do not abate. Ky. Rev. Stat. § 411.140. In that way, malicious prosecution claims under § 1983 are not the types of malicious prosecution tort claims that might abate under Kentucky law. Defendants' motion to dismiss for lack of jurisdiction is accordingly denied.

III.

A.  Turning to the merits, we begin with Miller's contention that the district court erred in holding that prosecutor Craycraft was entitled to absolute prosecutorial immunity.  On that basis, the district court dismissed the claims against Craycraft in accordance with Federal Rule of Civil Procedure 12(b)(6).  We review the district court's determination de novo, accepting the complaint's allegations as true and drawing all reasonable inferences in Miller's favor.  *Leech v. DeWeese*, 689 F.3d 538, 541–42 (6th Cir. 2012).  Because Craycraft is the party claiming immunity, he has the burden of establishing that his challenged behavior was prosecutorial in nature.  *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993).

"American law has long recognized 'absolute immunity' for those 'whose special functions or constitutional status requires complete protection from suit.'"  *Barnett v. Smithwick*, 835 F. App'x 31, 35–36 (6th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982)).  "That brand of immunity extends to government officers like prosecutors whose activities are 'intimately associated' with the judicial process."  *Id.* (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).  Prosecutors, alongside defense counsel, are tasked with equipping judges and juries to accurately determine a defendant's guilt.  That task necessarily entails making judgment calls as to how pre-trial matters are handled, trials are conducted, witnesses are used, and evidence is presented.  *Imbler*, 424 U.S. at 426.  Conduct of that ilk traditionally is accompanied by absolute immunity from civil liability.  *Id.* at 426–27.  In fact, prosecutorial immunity has a long reach—it extends even to "unquestionably illegal or improper conduct," including instances where a defendant is genuinely wronged.  *Cady v. Arenac County*, 574 F.3d 334, 340 (6th Cir. 2009).  Why?  To serve "the broader public interest" in preventing retaliatory lawsuits against prosecutors from gumming up the wheels of justice.  *Imbler*, 424 U.S. at 427.  That said, immunity from suit does not immunize badly behaving prosecutors from other forms of accountability—they can be subjected to court sanctions, removal from office, and criminal charges, among other ramifications.  *Id.* at 428–29.

Prosecutorial immunity's reach, however, has its limits.  *Buckley*, 509 U.S. at 273.  Conduct that falls outside the cloak of absolute immunity includes instances where the prosecutor's actions are not intimately associated with the judicial process.  *Id.*  That could

include, for example, investigative efforts to obtain an arrest warrant, authorize wiretaps, or advise the police. *Spurlock v. Thompson*, 330 F.3d 791, 798 (6th Cir. 2003) (discussing *Kalina v. Fletcher*, 522 U.S. 118, 130–31 (1997); *Burns v. Reed*, 500 U.S. 478, 496 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985); and *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (en banc)). It could also include other acts committed before or after the criminal proceeding. *Id.* at 798–99. In those and similar settings, prosecutors receive only qualified immunity. *Buckley*, 509 U.S. at 269.

Which camp, then, does Craycraft's conduct best represent? Recall that Miller's claim against Craycraft is centered on his successful pressuring of Martin to destroy her jailhouse correspondence with Hall. The behavior Miller describes in his complaint is difficult to justify and seemingly unbecoming of an official entrusted with enforcing the criminal law. At the same time, Craycraft has met his burden of establishing that the conduct at issue was committed in his role as prosecutor, rendering him immune from suit.

1. Because the conduct at issue was in furtherance of genuine prosecutorial interests, Craycraft has absolute immunity for his actions. *Rouse v. Stacy*, 478 F. App'x 945, 954 (6th Cir. 2012). Start with Craycraft advising Martin to destroy evidence, advice she acted upon. "Preparation of witnesses for trial is protected by absolute immunity." *Spurlock*, 330 F.3d at 797 (citing *Higgason v. Stephens*, 288 F.3d 868, 878 (6th Cir. 2002)). Martin was the key witness in Miller's ongoing prosecution. Communication with Martin itself was thus plainly within the prosecutorial role. True, as Miller notes, prosecutors do not receive absolute immunity when giving legal advice to police investigators, as in that capacity they act as investigators rather than prosecutors. *Watkins v. Healy*, 986 F.3d 648, 661 (6th Cir. 2021). But here, Craycraft was addressing matters related to Miller's prosecution with Martin, not telling police whether he believed their investigative techniques were satisfactory. *Compare Spurlock*, 330 F.3d at 798 (absolute immunity for directing witnesses to falsify testimony at trial), *with Burns*, 500 U.S. at 482 (no absolute immunity for advising police officers that evidence gathered from hypnosis "probably" supported a decision to arrest).

That Craycraft's advice prompted Martin to destroy exculpatory evidence does not change our conclusion. As a starting point, consider that prosecutors maintain their immunity

when intentionally failing to disclose exculpatory evidence. *Koubriti v. Convertino*, 593 F.3d 459, 467 (6th Cir. 2010). Allowing such cases to proceed, the Supreme Court has explained, "would 'weaken the adversary system at the same time it interfered seriously with the legitimate exercise of prosecutorial discretion.'" *Id.* (quoting *Imbler*, 424 U.S. at 431 n.34). And withholding and destroying evidence "often will be two sides of the same coin." *Annappareddy v. Pascale*, 996 F.3d 120, 142 (4th Cir. 2021) (citing *Imbler*, 424 U.S. at 431 n.34); *see also Ybarra v. Reno Thunderbird Mobile Home Vill.*, 723 F.2d 675, 679 (9th Cir. 1984) (prosecutors absolutely immune from suits for failing to preserve evidence). In the end, "what matters is the decision to withhold exculpatory evidence from a defendant and the judicial process," either by failing to disclose the evidence or failing to preserve it. *Annappareddy*, 996 F.3d at 142. In both instances, the "decision is made in an 'advocative' capacity." *Id.* Craycraft's role in the destruction of evidence thus did not exceed the scope of his immunity as a prosecutor. *See Heidelberg v. Hammer*, 577 F.2d 429, 432 (7th Cir. 1978) (prosecutors entitled to absolute immunity for destruction of evidence).

Resisting this conclusion, Miller points us to the Third Circuit's decision in *Yarris v. County of Delaware*, 465 F.3d 129 (3d Cir. 2006). There, prosecutors "deliberately destroyed . . . highly exculpatory information" that led to an innocent man being convicted. *Id.* at 132–33 & 136–37. "[D]estroying exculpatory evidence," the Third Circuit held, "is not related to a prosecutor's prosecutorial function." *Id.* at 136. In reaching that conclusion, our sister circuit distinguished the admittedly "well settled [precedent] that prosecutors are entitled to absolute immunity from claims based on their failure to disclose exculpatory evidence." *Id.* at 137. "[W]hile deciding not to furnish the prosecution's evidence to the defense may be an act of advocacy, throwing the evidence away is not such an act." *Id.* (quoting *Wilkinson v. Ellis*, 484 F. Supp. 1072, 1083 (E.D. Pa. 1980)). This dichotomy, however, pays little heed to the understanding that decisions regarding "the sufficiency of available evidence" or what to do with that evidence "cannot be characterized as merely administrative or . . . merely investigative." *Ybarra*, 723 F.2d at 679. That calculus, rather, "goes to the heart of the advocate's role 'in initiating a prosecution and in presenting the State's case.'" *Id.* (internal citation omitted). Holding otherwise seemingly would make actionable every good-faith decision by a prosecutor that evidence is immaterial and disposable, transforming criminal defendants into civil plaintiffs

whenever evidence is destroyed.  *See Imbler*, 424 U.S. at 431 n.34.  We need not tie the hands of prosecutors by requiring them to maintain and preserve everything collected as evidence, regardless of relevance to a criminal case and regardless of the burden such maintenance and preservation imposes.

2.  We reach the same conclusion with respect to Craycraft's purported thwarting of a court order.  Look back to Miller's complaint to frame the issue.  There, Miller alleged that Craycraft "facilitate[ed] the destruction of exculpatory evidence" by advising a witness to frustrate a valid court order.  That allegation is troubling, as the purported conduct is not something we condone or encourage.  Nevertheless, it is not conduct so outside the prosecutorial role that it loses its cloak of absolute immunity.  By definition, matters related to a court order in a criminal case are naturally part of the prosecutorial process.  The order was set to govern procedures related to the prosecution.  It was sought by Miller for purposes of defending himself in the prosecution.  And the destroyed evidence was believed to be highly relevant to the defense Miller would present at trial.

In similar circumstances, the Eighth Circuit affirmed an award of absolute immunity to a prosecutor who held a detainee without probable cause in violation of an order to either file an information or release him.  *Webster v. Gibson*, 913 F.2d 510, 513–14 (8th Cir. 1990).  Immunity was appropriate, the appeals court explained, because "disregard[ing] a court order to file an information would not place him outside the scope of his prosecutorial duties."  *Id.* (footnote omitted).  In many respects, *Webster* sweeps more broadly than our holding today:  it established a rule that prosecutors maintain absolute immunity in directly violating court orders presented to and directed at them.  As Craycraft did not violate a court order directed to him, we leave a question of that manner for resolution in a future case.  *See, e.g.*, *Odd v. Malone*, 538 F.3d 202, 214 (3d Cir. 2008) ("We can imagine few circumstances under which we would consider the act of disobeying a court order or directive to be advocative, and we are loath to grant a prosecutor absolute immunity for such disobedience.").

Here, Craycraft's actions are better described as advising a witness to act in unethical ways regarding evidence relevant to an ongoing prosecution.  This is related enough to the prosecutorial function to accord Craycraft absolute immunity.  We note that our concurring

colleague describes Craycraft as "receiv[ing] and violat[ing]" an order "that eliminated nearly all his discretion." Concurrence at 26 & 28 n.10. Miller's complaint, however, tells a somewhat different story. According to Miller, he secured an order requiring "any and all personnel of the Montgomery County Detention Center," "upon presentation of th[e] order," to "immediately go to Natasha Martin and retrieve from her all correspondence, letters and emails written to her [or] by her to Co-defendant Cody Hall," and to then produce those documents to Miller. Miller presented the order to a jail employee. The employee called Martin to inform her of the court's order. Martin then called Craycraft, who, according to the complaint, was aware of the order. Craycraft then "participated in the tampering and destruction of exculpatory physical evidence by encouraging" Martin to destroy those items. Only later, in responsive briefing, did Miller claim that Craycraft himself "violated" the order. That appears to be an implausible reframing of the complaint's allegations that Craycraft was never presented with or made subject to the order.

Miller cites a handful of cases he says warrant a different outcome. But in none of them was there an active prosecution at the time of the prosecutor's misdeed. The Third Circuit, for instance, concluded that holding a witness "in state custody *after the termination of the proceeding* in which he was to testify" was extraprosecutorial because there was no longer a prosecution to conduct when the prosecutor decided to hold the witness. *Odd*, 538 F.3d at 215 (emphasis added). The Fifth Circuit denied absolute immunity to a Mississippi district attorney who allowed a girl's father to see her after promising a California court that he would enforce its protective order; the district attorney was not prosecuting a case involving either the father or his daughter. *Chrissy F. ex rel. Medley v. Miss. Dep't of Pub. Welfare*, 925 F.2d 844, 847, 850–51 (5th Cir. 1991). And the Tenth Circuit found it "difficult to see how a prosecutor's actions in contravening the authority of the judicial branch of state government *in regard to the defense of a civil action* constitute the kind of advocacy related to the initiation and prosecution of criminal proceedings, even under the most generous interpretation of that phrase." *Gagan v. Norton*, 35 F.3d 1473, 1476 (10th Cir. 1994) (emphasis added).

In sum, we agree with the district court that Craycraft was absolutely immune from suit.

B. As to the remaining defendants, the district court granted them summary judgment on the basis of qualified immunity. Our standard of review on appeal is de novo. *Barton v. Martin*,

949 F.3d 938, 946 (6th Cir. 2020). Drawing all reasonable inferences in the light most favorable to the non-moving party, we ask whether a reasonable jury could return a verdict for Miller as to his claims for violations of the Fourth Amendment, which encompass fabrication of evidence, malicious prosecution, and related § 1983 claims. *Id.*

Qualified immunity is a different brand of immunity than absolute prosecutorial immunity. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity protects government officials who make mistakes while reasonably performing their duties, but allows for accountability when those officials "exercise power irresponsibly." *Id.* The legal test for determining whether qualified immunity applies is familiar. Officials are immune from suit when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). That formulation requires us to answer two questions in the affirmative before letting a suit against a government official proceed to discovery—did the official violate a plaintiff's constitutional right, and was that right clearly established at the time? *Id.* at 232. If the plaintiff fails either one of these questions, we need not consider the other. *Id.* at 236.

1. Miller first claims that defendants committed a Fourth Amendment violation by fabricating Martin's testimony implicating Miller. Fabrication of evidence claims require two showings: one, that evidence was knowingly fabricated; and two, that it is reasonably likely that the fabricated evidence affected the jury's decision. *Jackson*, 925 F.3d at 815 (citation omitted). As to the latter element, the relevant jury "decision" includes when fabricated evidence prompts the state to empanel a grand jury. *Id.* at 816–17. As Martin's testimony doubtlessly affected the decision to empanel a grand jury, Miller only needs to show that the evidence was fabricated.

Turning, then, to fabrication, Miller takes issue with defendants failing to record large segments of the interrogation, misleading Martin about her DNA being a match and other people implicating her, telling Martin information that she would need to sound plausible in her confession, threatening her and her children, promising her that she would go free if she cooperated, and telling her that she failed the polygraph test. Miller argues that, had a prosecutor known all the problems with the defendants' case against Miller, Kentucky would not have brought charges against him.

We are not persuaded that the evidence was plausibly fabricated. From a review of the record, it is difficult to agree with Miller's description of Martin's statement as entirely comprised of either facts fed to her or objectively wrong statements. For example, Martin confirmed, without prompting, the suspected use of radios by the perpetrators, the design of the stockings found at the scene, and which doors the perpetrators entered and exited through. Martin was also able to explain—apparently without knowledge that another witness had said the gun was thrown into a pond—why the divers were unable to find the gun in the pond. Miller is right that certain things were fed to Martin, either wittingly or unwittingly, that may have allowed her to believably make up a confession. But there is nothing to indicate that Charles, Fyffe, Shortridge, or anyone else knew that she had blatantly lied (if she in fact did) when the decision to empanel a grand jury was made.

Miller further speculates that defendants intentionally failed to record part of the interrogation to allow them to offer "more explicit promises" and conduct "witness coaching." While it is possible that the unrecorded parts of the interrogation involved witness coaching, that is always the case with anything conducted off the record. It seems equally likely that any one of an infinite number of explanations for the failure to record the interrogation could apply, such as it being genuinely accidental, for example. Without more, any such conclusion is beyond what a jury's reasonable inferences would allow.

Miller next points to the coercive tactics that defendants used to try to get Martin to fabricate her statement. Undoubtedly, defendants were trying to pressure Martin to speak out. Yet even then, there is not enough evidence to say that Martin's confession was coerced, never mind fabricated. *See Stroble v. California*, 343 U.S. 181, 191 (1952) ("His willingness to confess . . . after he had been arraigned and counsel had been appointed, and in circumstances free of coercion, suggests strongly that" the confession was not "the result of coercion, either physical or psychological."). Miller suggests that Martin "cav[ed] to" defendants' threats when she offered to "make something up" if that is what they wanted. Opening Br. at 36 (quoting R.118-30, PageID# 2957). Fyffe, however, told Martin otherwise: "You start talking, and you tell me the truth. That's what—that's all he wants is the truth. You know about the truth." R.118-30, PageID# 2957. It is exceedingly difficult to read that statement as "knowingly

fabricating" Martin's testimony, even if Fyffe knew he was exerting pressure on her. All told, Miller's fabrication of evidence claim cannot survive summary judgment.

2. In the district court, Miller also claimed that defendants Charles, Collier, Fyffe, Jones, and Shortridge prosecuted him without probable cause in violation of his Fourth Amendment right to be free from unreasonable seizure. On appeal, he renews those claims of malicious prosecution as to Charles, Fyffe, and Shortridge. To prove a § 1983-based malicious prosecution claim, Miller must establish four elements for each defendant: (1) the defendant made, influenced, or participated in the decision to initiate a prosecution against him; (2) there was not probable cause for the prosecution; (3) the legal proceeding caused a deprivation of liberty beyond the initial seizure; and (4) the criminal proceeding against him was resolved in his favor. *Johnson v. Moseley*, 790 F.3d 649, 654 (6th Cir. 2015).

Beginning with the sheriff, Shortridge prevails on the first element, as he neither influenced nor participated in the decision to prosecute Martin. The governing standard sets a high bar for Miller to clear. "Providing reports, affidavits, or other investigative materials containing falsehoods, omissions, or misstatements to a prosecutor can constitute participation when (1) those materials formed the basis for the charge," and (2) "were made deliberately or with reckless disregard for the truth." *Tlapanco v. Elges*, 969 F.3d 638, 655 (6th Cir. 2020) (citation omitted). The second element has a gatekeeping effect, as "[a]llegations of negligence or innocent mistake are insufficient." *Moseley*, 790 F.3d at 655 (citing *Robertson v. Lucas*, 753 F.3d 606, 617 n.7 (6th Cir. 2014)). As to Shortridge, however, Miller points to no reports, affidavits, or investigative materials prepared by Shortridge that would have influenced the decision to prosecute Miller. Perhaps, as Miller claims, Shortridge was aware of arguably exculpatory information that he failed to ensure was known by the prosecution. Yet Miller does not claim that Shortridge told prosecutors any of the supposed lies or anything else.

Now consider Fyffe, the polygrapher. Miller claims that Fyffe engaged in misinformation with the pre-polygraph reports. For support, Miller points to the pre-polygraph report's inclusion of Martin's supposed statements relating to her presence at the crime scene. By all accounts, however, Fyffe's understanding of the investigation came from Charles, who relayed to Fyffe information he was told by a witness. According to the witness, Martin said that

she was present at the crime scene when Brewer was shot.  No reasonable jury could conclude that Fyffe deliberately or recklessly attempted to mislead anybody in simply reporting what he was told by Charles.

Miller makes the same general allegation with respect to the information in the post-polygraph report.  Specifically, Miller asserts that Fyffe lied about Martin failing the examination.  But Miller rests this argument entirely on his expert's testimony that polygraphs are unscientific.  That general observation does not cast doubt on the genuineness of Fyffe's belief that Martin failed her exam.

That leaves Charles, the detective.  Charles's report was arguably misleading with respect to Martin's identification of the other woman and her familiarity with the location of the crime scene.  But even if Miller satisfies the first element, he fails to meet his burden on the second, as there was probable cause to arrest Miller.  *See Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007) (explaining that malicious prosecution claims fail "when there was probable cause to prosecute"), *abrogated on other grounds by Pearson*, 555 U.S. at 227.  Begin with the recognition that Miller was indicted by a grand jury, a fact that generally serves as rebuttable "proof of probable cause."  *King v. Harwood*, 852 F.3d 568, 587 (6th Cir. 2017).  To rebut that presumption, Miller has to show:  (1) Charles knowingly or recklessly made false statements, falsified evidence, or fabricated evidence to set a prosecution in motion; (2) the statements and evidence, along with concealments and misleading omissions, were material to the prosecution; and (3) the statements and evidence were not merely grand jury testimony or, in the broad sense, part of the preparation for such testimony.  *Id.* at 587–88.  The district court concluded that Miller did not rebut the presumption.

We agree.  To begin, none of Charles's conceivable omissions or misstatements were false, nor did Charles falsify or fabricate evidence.  Look back to the omissions and misstatements that Charles plausibly made:  he reported Martin's statement that either "Keenie Helton or Kyla Walters" was the other woman; and he reported that Martin said she got out of the car in front of Brewer's house and that the car then parked "on an undeveloped street behind the property."  Even if these statements are misleading, they are not false.  That being the case,

Miller has not shown that Charles knowingly or recklessly made false statements, falsified evidence, or fabricated evidence to set a prosecution in motion.

Nor was Charles's report material to the prosecution. Martin was a co-defendant and accomplice who, in the presence of counsel, admitted that she, along with Miller, participated in the robbery gone wrong. While some of her statements were contradicted by the record, other parts corroborated what the investigators knew and did not share with her or the public. And her explanation for misremembering was plausible—she was "very, very high" when the murder occurred. Prosecutors were aware of all of this when they decided to prosecute Miller. From this record, there was more than enough to support probable cause to do so. *See United States v. Hayes*, 49 F.3d 178, 181 (6th Cir. 1995) ("[T]he uncorroborated testimony of an accomplice may be enough to support a conviction, thus by implication, the corroborated testimony of an accomplice or co-defendant will also suffice." (internal citation omitted)). As to Charles too, then, Miller's malicious prosecution claim fails because a reasonable jury could not conclude there was no probable cause for his prosecution.

3. The district court also granted summary judgment to defendants on Miller's failure to supervise, failure to intervene, civil conspiracy, and municipal liability claims. The flaw in Miller's theory, the district court explained, was that he did not show an underlying constitutional violation that would have permitted recovery on these bases. To revive those arguments, Miller needed to revive either his malicious prosecution or his evidence fabrication claim. *See Griffith v. Franklin County*, 975 F.3d 554, 579 (6th Cir. 2020) ("[A] plaintiff cannot establish a claim for supervisory liability without establishing an underlying constitutional violation by a supervised employee."); *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 413 (6th Cir. 2015) ("[B]ecause there is no underlying constitutional violation, [the officer] may not be liable for failure to intervene."); *Stricker v. Township of Cambridge*, 710 F.3d 350, 365 (6th Cir. 2013) (Conspiracy claim needs an underlying constitutional violation); *Robertson*, 753 F.3d at 622 ("There can be no liability under *Monell* without an underlying constitutional violation."). In light of the above, the district court did not err by dismissing these claims.

C. In addition to the claims under § 1983, Miller also brought Kentucky law claims for malicious prosecution against the individual defendants and for negligent supervision against

Montgomery County. The district court granted summary judgment to defendants on both sets of claims. Miller's claim against Montgomery County has been abandoned on appeal. The state malicious prosecution claims fare no better. They require what the federal claims likewise require, except that a plaintiff also needs to show that defendants acted with malice. *See Martin v. O'Daniel*, 507 S.W.3d 1, 5, 11–12 (Ky. 2016). On appeal, Miller merely argues that the claim should be reinstated for the reasons that his federal claim should be reinstated. As those claims fail, so does this one.

\* \* \* \* \*

For the reasons given above, we affirm the judgment of the district court.

---

**CONCURRING IN PART AND IN THE JUDGMENT**

---

NALBANDIAN, Circuit Judge, concurring in part and concurring in judgment. I agree with nearly all the majority opinion. But the majority and I part ways on Part III.A, which concerns prosecutorial immunity. A prosecutor bears the burden of showing that he is entitled to absolute immunity. And he has two ways of meeting his burden. Option one: he can prove that 1871 common law and history recognized that the relevant conduct would get absolute immunity. Option two: he can prove that the challenged conduct falls within the traditional role of an advocate. If a prosecutor can't satisfy either option, his actions are not entitled to absolute immunity. And under that framework, two of Prosecutor Craycraft's actions—advising a witness and destroying evidence—warrant absolute immunity. But his third action—violating a court order—is only entitled to qualified immunity. Still, under qualified immunity, he prevails.

**I.**

Even though the plain language of 42 U.S.C § 1983 doesn't address immunity for state actors, the Supreme Court has held that immunity—both qualified and absolute—applies in actions under the statute.[1] The Court first addressed prosecutorial immunity under § 1983 in *Imbler v. Pachtman*. *See* 424 U.S. 409, 420 (1976). Because § 1983 didn't abrogate immunities "well grounded in history and reason," *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951), *Imbler* looked to "the immunity historically accorded [to prosecutors] at common law and the interests behind it" to decide that prosecutors could receive absolute immunity in § 1983 actions, 424 U.S. at 421, 427. Extending "common-law immunity" to prosecutors was "based upon" protecting

---

[1]Some have argued that the justification for granting immunity in § 1983 actions—"that Congress wouldn't have abrogated common-law immunities absent explicit language"—is "faulty because the 1871 Civil Rights Act *expressly included such language*." *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willett, J., concurring). Emerging scholarship suggests that the express abrogation of common-law immunities only dropped out of the statute when "[f]or reasons lost to history, [the language] was inexplicably omitted from the first compilation of federal law in 1874." *Id.* That is, "[t]he Reviser of Federal Statutes made an unauthorized alteration to Congress's language." *Id.* So, according to this recent scholarship, because the Civil Rights Act of 1871 explicitly abrogated the common-law immunities grounded in state law, those immunities are abrogated now *sub silentio* under the current version of § 1983. *Id.*; *see* Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871); Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201, 235 (2023).

their discretion "within the scope of their duties"—the same rationale that warranted "common-law immunities of judges and grand jurors acting within the scope of their duties."**[2]** *Id.* at 422–23 & n.20. *Imbler* decided that absolute immunity could apply to prosecutors and that it was a prosecutor's burden to establish entitlement to absolute immunity. But *Imbler* didn't tell us how a prosecutor meets that burden.

So after *Imbler*, the Court decided two seminal cases—*Burns v. Reed* and *Buckley v. Fitzsimmons*—that shaped how we determine whether a prosecutor is entitled to absolute immunity. A prosecutor can establish an entitlement to absolute immunity based on the approach in either case. In other words, we have two options to prove one common-law burden. I'll address each in turn.

**A.**

First, *Burns*. 500 U.S. 478 (1991). *Burns* identified three tools in the prosecutor's toolkit for establishing entitlement to absolute immunity. First (and most important), the common law of 1871. *See id.* at 494. To "discern Congress' likely intent in enacting § 1983," the Court held that prosecutors should appeal "to American common law and other history" to establish a claim to absolute immunity. *Id.* at 493. So prosecutors could take the function at issue—say, participating in a probable-cause hearing—and demonstrate that the function received immunity in 1871. *See id.* at 489–90.

In doing so, prosecutors could appeal to the "several categories of immunities" that "pre–1871 common-law courts [] recognize[d]." *Id.* at 499 (Scalia, J., concurring in the judgment in part and dissenting in part); *see id.* at 499–501 (laying out (1) judicial immunity, (2) quasi-

---

**[2]**I remain skeptical as to whether, in 1871, common-law practice recognized absolute prosecutorial immunity. As some have recognized, history suggests that "prosecutorial action would have enjoyed only qualified immunity." *Burns v. Reed*, 500 U.S. 478, 497 (1991) (Scalia, J., concurring in the judgment in part and dissenting in part); *see Kalina v. Fletcher*, 522 U.S. 118, 132 (1997) (Scalia, J., concurring) ("There was, of course, no such thing as absolute prosecutorial immunity when § 1983 was enacted."); Scott A. Keller, *Qualified and Absolute Immunity at Common Law*, 73 Stan. L. Rev. 1337, 1367 (2021) ("While absolute immunity was frequently extended to government prosecutors throughout the rest of the twentieth century, the common law of 1871 had not recognized any such immunity."). Even so, other categories of immunities, as recognized by pre-1871 common-law courts, might still, as a historical matter, extend to prosecutorial functions. *Burns*, 500 U.S. at 499–501 (Scalia, J., concurring in the judgment in part and dissenting in part). Such categories include (1) judicial immunity, (2) quasi-judicial immunity, and (3) defamation immunity. *Id. But see* William Baude, *Is Quasi-Judicial Immunity Qualified Immunity?*, 74 Stan. L. Rev. Online 115, 119–20 (2022).

judicial immunity, and (3) defamation immunity); *supra* n.2. And now, unlike in 1991 when *Burns* was decided, we have more tools available to see whether prosecutors have met their burden. *See, e.g.*, William Baude & Jud Campbell, *Early American Constitutional History: A Source Guide*, SSRN (last updated March 13, 2023).

On the policy front, *Burns* listed two concerns. First, prosecutors should strive to show that there is a "risk of vexatious litigation" if the action only received qualified immunity. *Burns*, 500 U.S. at 494. That's because absolute immunity was "designed to free the *judicial process* from the harassment and intimidation associated with litigation." *Id.* And second, a prosecutor could argue that "several checks other than civil litigation" existed to combat prosecutorial abuse, so granting absolute immunity would not pose an accountability concern. *Id.* at 496. To sum it up, *Burns* held that prosecutors could use the common law in 1871 plus two policy justifications to establish an entitlement to qualified immunity.

**B.**

Then came *Buckley*. *Buckley* didn't change *Burns*'s burden. Instead, *Buckley* gave prosecutors a shortcut to meeting that burden—an alternative to showing that the common law supported a finding of absolute immunity. *Buckley* categorized one specific function as having received common-law immunity in 1871. It labeled this function: the "role as an advocate for the State." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ("[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the state, are entitled to the protections of absolute immunity.").

So post-*Buckley*, rather than go through the trouble of finding common-law support through independent historical research in each case per *Burns*, prosecutors could meet the "burden of establishing that they were functioning as 'advocates' when" committing the conduct alleged to meet the *necessary* (but not sufficient) condition for finding absolute immunity. *Id.* at 274.

To do the *Buckley* analysis, the Court necessarily had to define what it meant to function as an advocate. The Court suggested that we should evaluate (1) when the alleged conduct

occurred, and (2) whether that conduct would have traditionally fallen within an advocate's discretion (or someone else's). *Id.* at 273, 278. I'll tackle each of these.

First, we look at *when* the alleged conduct occurred. If the conduct occurred while "preparing for the initiation of judicial proceedings or for trial" or "presenting the State's case," that timing favors granting absolute immunity. *Id.* at 270, 273 (citation omitted). But "where the role as advocate has not yet begun, namely prior to indictment, or where it has concluded, absolute immunity does not apply." *Spurlock v. Thompson*, 330 F.3d 791, 799 (6th Cir. 2003).

So we can reject an absolute immunity defense if "no adversarial judicial proceeding [was] taking place" when the challenged conduct occurred. *Jackson v. City of Cleveland*, 64 F.4th 736, 745 (6th Cir. 2023). And we will do the same if the challenged conduct takes place "before any probable cause hearing," "before any arrest warrant was sought," "before a grand jury was convened," *Watkins v. Healy*, 986 F.3d 648, 662 (6th Cir. 2021), or more generally, "during [a] preliminary investigation of an unsolved crime," *Buckley*, 509 U.S. at 275.

But even if a prosecutor's conduct occurs in preparation for or perhaps while the trial is ongoing, that does not mean that absolute immunity will apply. That's because some "acts in preparing for those functions . . . would be absolutely immune," while others—such as those of "investigation" or "administration"—typically "would not." *Id.* at 270, 273 (citation omitted); *see Imbler*, 424 U.S. at 431 n.33.

So we turn to the second factor in *Buckley*: whether the conduct would have traditionally fallen within an advocate's discretion or someone else's. *See Buckley*, 509 U.S. at 268–69 (explaining that "some officials," like prosecutors, perform "special functions," so "absolute protection from damages liability" is necessary to "protect . . . their discretion"); *id.* at 278 (explaining that absolute immunity doesn't cover prosecutorial conduct that serves a purpose other than advocacy, even if it's a "vital public function"); *Kalina v. Fletcher*, 522 U.S. 118, 131 (1997) (explaining that absolute immunity fully protects "the traditional functions of an advocate"); *see generally Westfall v. Erwin*, 484 U.S. 292, 297 (1988), *superseded by statute as recognized in Juide v. City of Ann Arbor*, 107 F.3d 870, at *3 (6th Cir. 1997) (unpublished table

decision) (noting Congress could provide absolute immunity for nondiscretionary functions that the common law never traditionally protected).**[3]**

To determine whether conduct constitutes a traditional function, we can first ask "whether the actions in question are those of an advocate" or someone else. *Cady v. Arenac County*, 574 F.3d 334, 340 (6th Cir. 2009) (quoting *Skinner v. Govorchin*, 463 F.3d 518, 525 (6th Cir. 2006)); *see Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (looking at a prosecutor's "*capacity as a legal advocate*").**[4]** It's simple. An advocate's role is advocacy. He must act within the "scope of" his advocative "duties"—and that scope usually involves the exercise of discretion. *Kalina*, 522 U.S. at 124 (citation omitted); *see Imbler*, 424 U.S. at 420; *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002). So if a prosecutor can perform the conduct within his discretion as an advocate for the state—such as "the professional evaluation of the evidence assembled by the police" or the "preparation for its presentation at trial or before a grand jury"— that conduct gets absolute immunity for falling within the function of advocacy. *Buckley*, 509 U.S. at 273.

And what's critical in thinking about the traditional function of an advocate is the discretion the advocate is exercising—because again, common law absolute immunity was grounded in the discretion afforded to juries and judges at trial. *Imbler*, 424 U.S. at 422–23 & n.20; *Kalina*, 522 U.S. at 129–30 (reasoning that absolute immunity doesn't extend to just anyone "exercis[ing] [] professional judgment"—it extends only to the "exercise of [] judgment of the *advocate*" (emphasis added)). And there's good reason to focus on a prosecutor's lack of discretion. Many actions a prosecutor might take in attempting to be an advocate could go well beyond an advocate's discretion. For example, a prosecutor could try to influence a plea

---

**[3]**The Supreme Court's decision in *Westfall v. Erwin* was superseded by statute, but the analysis stands. Indeed, the Court found that "absolute immunity for nondiscretionary functions finds no support in the traditional justification for official immunity." 484 U.S. at 297. After that, Congress acted. And it provided what the common law didn't—absolute immunity for nondiscretionary functions for federal employees. *See Juide*, 107 F.3d at *3. By contrast here, Congress has yet to provide what the common law doesn't—absolute immunity for state prosecutors' nondiscretionary actions in the § 1983 context.

**[4]**Our analysis looks at "the nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269 (citation omitted). That means, for the sake of the analysis, we don't grant a prosecutor absolute immunity just because he is in fact a prosecutor. But the question of who *actually* performed the conduct involves a different inquiry from the question of who *would have* traditionally performed the conduct.

negotiation by directing jailers to beat up a criminal defendant, "beating his wife, kidnapping his children, or burning a cross on his lawn." *Rouse v. Stacy*, 478 F. App'x 945, 954 (6th Cir. 2012). Each of those acts may further the state's goals of advocacy. But each fall outside an advocate's discretion. *See id.* at 954–55, 56. And each doesn't obtain absolute immunity. *Id.*

And beyond a prosecutor acting outside his discretion as an advocate, some actions a prosecutor takes may not be advocative—but rather investigative or administrative. *See Adams v. Hanson*, 656 F.3d 397, 402, 409 (6th Cir. 2011); *see Imbler*, 424 U.S. at 431 n.33 ("At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court.").[5] So, for example, when prosecutors commit acts traditionally performed by a complaining witness (like testifying in court), *see Kalina*, 522 U.S. at 127, an official dealing with the press (like speaking at a press conference), or a police officer (like fabricating evidence in a police investigation), they "ha[ve] no greater claim to complete immunity" than those who traditionally performed those actions, *see Buckley*, 509 U.S. at 274. Similarly, that's why the Attorney General of the United States only gets "qualified, rather than absolute, immunity when engaged in the performance of national defense functions rather than prosecutorial functions." *Kalina*, 522 U.S. at 127. So *Buckley* looks at the role of the advocate and the prosecutor's discretion within that role to determine whether absolute immunity is warranted.

## II.

With that framework in mind, we can analyze whether Prosecutor Craycraft meets his common-law burden to obtain absolute immunity. Miller alleges that Craycraft committed three acts: (1) advising a witness; (2) destroying alleged exculpatory evidence; and (3) violating a court order that directed the prosecution to hand over the evidence to Miller. (Appellant Br. at

---

[5]But one exception on the administrative front: administrative actions taken by a prosecutor can still receive absolute immunity if the conduct is "tied to the trial process." *Stockdale v. Helper*, 979 F.3d 498, 504 (6th Cir. 2020). "[C]ertain kind[s] of administrative obligation[s]" are "directly connected with the conduct of a trial." *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009). The obligations should also "necessarily require legal knowledge and the exercise of related discretion." *Id.* Only those kinds of administrative actions can receive absolute immunity without the showing of common-law protection. So this takes us back to the first *Buckley* factor—timing matters.

53.)  Because we're at the motion-to-dismiss stage, we should credit Miller's plausible allegations as true. *Leech v. DeWeese*, 689 F.3d 538, 542 (6th Cir. 2012).

Craycraft attempts to follow the *Buckley* rationale by saying that he "is only alleged to have acted as an advocate." (Craycraft Br. at 8.)  I think that absolute immunity covers the first two of his actions—advising a witness and destroying evidence—because under *Buckley* those functions involve a prosecutor's discretion in the traditional role of an advocate.  But Craycraft hasn't shown that the third action—violating a court order—meets either the *Burns* or *Buckley* rationale for establishing absolute immunity.

**A.**

Start with Craycraft's first two actions—advising a witness and destroying evidence— under the *Buckley* approach.  First, we look at *when* the alleged conduct took place.  The conduct here occurred after Miller's arrest and indictment for murder and robbery.  Craycraft allegedly advised a witness to destroy evidence in the discovery phase of the criminal action.  Seeing that the alleged acts occurred while "preparing for the initiation of judicial proceedings or for trial," the timing here favors granting Craycraft absolute immunity. *Buckley*, 509 U.S. at 273; *cf. Spurlock*, 330 F.3d at 799; *Watkins*, 986 F.3d at 662.

Next, we look at whether a prosecutor would have traditionally had the discretion to advise witnesses and get rid of evidence. *See Kalina*, 522 U.S. at 131; *Buckley*, 509 U.S. at 278. The short answer is that he would have. *See Imbler*, 424 U.S. at 426 (explaining that prosecutors have "wide discretion" over decisions involving "witnesses" and "presentation of evidence" to prepare and present the state's case).

First, advising a witness.  Courts have long understood that a prosecutor acts as an advocate when controlling what witnesses do in preparation for trial.  "Prosecutorial decisions regarding witness testimony, including what witnesses to use at trial and what questions to ask them, are activities intimately associated with the judicial phase of a criminal trial and, therefore, are protected by absolute prosecutorial immunity." *Spurlock*, 330 F.3d at 798; *see Higgason,* 288 F.3d at 878.

*Buckley* recognized that prosecutors act as advocates (and get absolute immunity) when they exert "an out-of-court 'effort to control the presentation of [a] witness['s] testimony.'" 509 U.S. at 272–73 (quoting *Imbler*, 424 U.S. at 430 n.32) (first alteration in original).  That's why granting absolute immunity from § 1983 suits for "eliciting false or defamatory testimony from witnesses" "accord[s] with the common-law absolute immunity of prosecutors."  *Id.* at 270.  Because prosecutors could traditionally advise witnesses on matters related to the state's presentation of its case, I would find that Craycraft acted within his discretion as an advocate.

Second, destroying exculpatory evidence.  *Imbler* acknowledged that prosecutors retain discretion over what evidence they disclose and that absolute immunity attaches to their exercise of that discretion.  424 U.S. at 431 n.34.  And since *Imbler*, we have confirmed that prosecutors receive absolute immunity for the intentional failure to disclose material exculpatory evidence at trial—i.e., committing *Brady* and *Giglio* violations.  *See Koubriti v. Convertino*, 593 F.3d 459, 467, 470 (2010); *Jones v. Shankland*, 800 F.2d 77, 80 (6th Cir. 1986).  Such decisions go to the heart of discretionary actions that prosecutors must make in preparing evidence for trial and presenting the state's case.  Craycraft's conduct—getting rid of evidence he didn't want to use (and didn't want Miller to use) at trial—is a discretionary action that warrants absolute immunity.**[6]**  *See Imbler*, 424 U.S. at 431 n.34 (explaining that even discretionary unlawful acts—

---

**[6]**To be fair, the idea that destroying exculpatory evidence is protected by absolute immunity seems incongruous with what ought to be our instincts about fairness and justice.  *Imbler*, 424 U.S. at 441 (White, J., concurring in the judgment) ("It is apparent that the injury to a defendant which can be caused by an unconstitutional suppression of exculpatory evidence is substantial, particularly if the evidence is never uncovered.").  But this is the natural consequence of *Imbler*'s conclusion that we look solely to whether the relevant function serves as an "integral part of the judicial process" or is "intimately associated with the judicial phase of the criminal process."  *Id.* at 430 (citation omitted).  As far as I can tell, *Imbler*'s purely functional approach does not ask whether the actions are an integral part of or intimately associated with a fair or just judicial process or whether the actions are consistent with the "role" of a fair "advocate" in our system.  *Buckley*, 509 U.S. at 273.  And even though these kinds of inquiries raise the specter of unmoored judicial decision making, they would perhaps not be out of bounds, considering that the immunity analysis itself is unmoored from the text of § 1983.

It is also a consequence of putting great weight on when the prosecutor's actions took place, i.e., pre- or post-indictment.  *See id.*  But that timing distinction seems odd.  The most relevant timing would seem to be whether those actions or statements occur "in the course of a court proceeding."  *Burns*, 500 U.S. at 501 (Scalia, J., concurring in the judgment in part and dissenting in part).  Some pre-indictment actions surely result in testimony or exhibits relevant to an actual proceeding, and some post-indictment actions are surely still investigative.

These questions, of course, are not new—the Court has weighed these interests and others in deciding where to draw the "proper line."  *Imbler*, 424 U.S. at 431 nn.33 & 34.  But some on the Court have questioned the current state of immunity jurisprudence.  And that combined with the Court's renewed focus on the common-law foundations of legal doctrine suggests that the Court may want to take a fresh look at this issue.  *See Baxter v.*

like the "knowing use of perjured testimony" and the "deliberate withholding of exculpatory information"—can be cloaked in absolute immunity to protect the "adversary system"); *Koubriti*, 593 F.3d at 467, 470; *Jones*, 800 F.2d at 80.

**B.**

Finally, the violation of a court order. Until today, our Circuit has not decided whether a prosecutor acts within the role of an advocate when he violates a clear court order. *See also White ex rel. Swafford v. Gerbitz*, 860 F.2d 661, 665 n.4 (6th Cir. 1988) (noting in dicta that a violation of a court order does "not fall within the purview of the protections afforded by *Imbler* immunity"). And the Supreme Court has not directly answered the question.

As with the first two acts, Craycraft violated the order during the discovery phase of Miller's prosecution. So this timing supports granting absolute immunity.[7] *See Buckley*, 509 U.S. at 273. Even then, however, just because the conduct occurred in preparation for trial isn't sufficient to justify extending absolute immunity. We consider more. *Id.* at 270, 273 (citation omitted); *see Imbler*, 424 U.S. at 431 n.33.

So the next question is whether Craycraft has shown that he was acting within his discretion as an advocate when he violated a court order—one that eliminated nearly all his discretion. He hasn't made that showing. Violating a court order that leaves no room for discretion is not a function an advocate "normally perform[s]." *Id.* at 274 (citation omitted); *see Odd v. Malone*, 538 F.3d 202, 214 (3d Cir. 2008) ("We can imagine few circumstances under

*Bracey*, 140 S. Ct. 1862, 1864 (2020) (Thomas, J., dissenting from the denial of certiorari) ("[W]e at least ought to return to the approach of asking whether immunity 'was historically accorded the relevant official in an analogous situation at common law.'" (citation omitted)); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1872 (2017) (Thomas, J., concurring in part and concurring in the judgment) ("Until we shift the focus of our inquiry to whether immunity existed at common law, we will continue to substitute our own policy preferences for the mandates of Congress."); Keller, 73 Stan. L. Rev. at 1341; *see also Rehberg v. Paulk*, 566 U.S. 356, 366 (2012) (Alito, J.) (recognizing that *Imbler* "did not simply apply the scope of immunity recognized by common-law courts as of 1871"); *Kalina*, 522 U.S. at 135 (Scalia, J., joined by Thomas, J., concurring) ("*Imbler*'s principle of absolute prosecutorial immunity . . . make[s] faithful adherence to the common law embodied in § 1983 very difficult.").

[7]It is worth noting that the timing here pushes the envelope of what 1871 common-law immunities protected. Craycraft's conduct, although it involved a court order, took place outside of the courtroom and the grand jury room, which would take it outside of the protection traditionally extended to defendants in defamation suits. *Burns*, 500 U.S. at 501 (Scalia, J., concurring in the judgment in part and dissenting in part) (noting that the common law afforded absolute immunity to witnesses for "all statements made in the course of a court proceeding" in later defamation suits).

which we would consider the act of disobeying a court order or directive to be advocative, and we are loath to grant a prosecutor absolute immunity for such disobedience."). Such an act does "not fall within the purview of the protections afforded by *Imbler* immunity." *White ex rel. Swafford*, 860 F.2d at 665 n.4; *see id.* (Jones, J., concurring in part and dissenting in part) (seeking to affirm based on the denial of absolute immunity).

That's because under *Buckley*, where a prosecutor has no discretion to act in his role as an advocate, he can't get absolute immunity.[8] Again, courts give prosecutors absolute immunity to protect the "wide discretion" they have in carrying out a case. *Imbler*, 424 U.S. at 426. And we want to avoid "hamper[ing] [prosecutors] in exercising their judgment" or "prevent[ing] the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." *Id.* at 427–28.

But there is no wide discretion to violate an explicit court order. "Such an order— perhaps one enumerating specific documents that the prosecutor must turn over to the defendant—does not leave room for the prosecutor, fearing future liability, to 'shade his decisions[.]'" *Munchinski v. Solomon*, 747 F. App'x 52, 59 (3d Cir. 2018) (quoting *Imbler*, 424 U.S. at 423). A prosecutor may challenge the order by appropriate means or comply. *See id.* And in choosing whether to comply, "[t]he prosecutor's duties . . . become ministerial or administrative, rather than advocative." *Siehl v. City of Johnstown*, 365 F. Supp. 3d 587, 598 (W.D. Pa. 2019) ("When a court order, by its terms, severely limits a prosecutor's discretion, the prosecutor's duty in the face of such an order is not to advocate, but to comply.").

True, some court orders allow for discretion, such as when a court issues a broad order to disclose "exculpatory" evidence.[9] *See Reid v. New Hampshire*, 56 F.3d 332, 337 (1st Cir. 1995) (holding that an order requiring the police to turn over "any 'exculpatory' evidence" left discretion to the prosecutors to make judgments on what evidence to hand over). But "[t]he

---

[8]Craycraft would run into the same problem under a *Burns* analysis too. My guess is that he'd have trouble showing that the common law in 1871 and its relevant policy justifications would support absolute immunity for violating a clear court order. In any event, he hasn't made that showing.

[9]As mentioned, prosecutors have discretion to decide what evidence is "exculpatory" and subject to disclosure. *See Koubriti*, 593 F.3d at 467, 470; *Jones*, 800 F.2d at 80.

more discretion a judicial order eliminates from the prosecutor's role, the more likely it is that a violation of that order strips the prosecutor of absolute immunity." *Munchinski*, 747 F. App'x at 58–59. And "[a]n obligation to carry out a clear court order involves no exercise of discretion." *Jordan v. Sinsheimer*, 531 N.E.2d 574, 576 (Mass. 1988).

The court order in this case specified exactly what evidence Craycraft had to turn over to defense counsel.[10] The court first stated that it found the specific documentary "evidence [] exculpatory in nature and necessary to the defense of Defendant Nicki Miller." (R. 118-70, Court Order, p. 1.) The court then ordered that state officials "immediately go to [two defendants] and retrieve from [them] all correspondence, letters and emails" that they sent each other. (*Id.*) Because the order "was *ex parte*, the only persons privy to the order were Court staff, the defense team, and the prosecution team assigned to the case." (R. 1, Complaint, p. 25 ¶ 162.) Importantly, "Craycraft was one of the limited individuals privy to the . . . sealed order." (*Id.*) And after learning about the order, the complaint further alleges that Craycraft prompted the destruction of the evidence in violation of the order. (*Id.*, p. 26 ¶ 170–74.) So a plain reading of the complaint and the court order shows that Craycraft was presented with and made subject to the court order.

The court order had one directive—turn over the specific evidence. The order left no room for debate about whether particular evidence was exculpatory, relevant, or otherwise privileged. *See Reid*, 56 F.3d at 337. It involved no trial preparation, no strategy, no close calls on the evidence. Craycraft could either comply or challenge the order through lawful means. Those were the only two options. But violating the order was not within his discretion as an advocate. So he has failed to establish that he is entitled to absolute immunity. *See Buckley*, 509 U.S. at 273. Further, he has not otherwise proven that he would receive absolute immunity under

---

[10]The majority states that the order was not specifically "directed to" Craycraft but to the state more generally. (Maj. Opinion at 12.) And because of that, the majority "leave[s] the question" of whether a prosecutor receives absolute immunity for violating a court order directed specifically to him "for resolution in a future case." (*Id.*) But the difference between a court order directed to the state generally or a specific prosecutor creates a distinction without a difference—especially here, where, as the majority notes, Craycraft was "assigned to take lead on the case." (*Id.* at 6.) Either way, the court order was sent by the court to protect specific documentary "evidence [] exculpatory in nature and necessary to the defense" in Miller's prosecution. (R. 118-70, Court Order, p. 1.) And Craycraft, the "lead" prosecutor on the case, (Maj. Opinion at 6), received and violated that order, even though it also bound his discretion. (R. 1, Complaint, p. 25 ¶¶ 162, 170–74.)

1871 common law. *See Burns*, 500 U.S. at 494. In the end, Craycraft failed to meet his common-law burden under either *Buckley* or *Burns*.

Lastly, it is important to recognize why courts should treat prosecutors who violate restrictive court orders differently from those who fail to meet their obligations under *Brady* or other blanket criminal rules. Prosecutors face routine restrictions in preparation for trial. And *Brady* is a good example of that. *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (restricting prosecutors from suppressing material evidence favorable to the accused upon request). But even rules like *Brady* require prosecutors to make judgment calls.

Under *Brady*, prosecutors must determine "what evidence in their possession [i]s 'exculpatory' and subject to disclosure." *Reid*, 56 F.3d at 337. *That* know-how is what makes a *Brady* violation inapposite to the court-order violation here. In exercising discretion as an advocate, prosecutors can place evidence aside that they believe is not material either to guilt or punishment. *See generally Imbler*, 424 U.S. at 425 (recognizing that prosecutors "inevitably make[] many decisions that could engender colorable claims of constitutional deprivation"). And they can do so while protected by absolute immunity. *See id.* at 431 n.34; *Koubriti*, 593 F.3d at 467, 470; *Jones*, 800 F.2d at 80.

But things change when a prosecutor is stripped of all discretion. And a court order that directs the state to turn over specific pieces of evidence does just that. When that happens, as I explained above, there is no longer any judgment call for the prosecutor to make. And for that reason, Craycraft's violation of the court order should be treated differently from destroying *Brady* evidence.

## III.

Even when a prosecutor doesn't get absolute immunity under § 1983, he can get qualified immunity, which the Supreme Court has presumed will provide a sufficient shield from liability. *Burns*, 500 U.S. at 486. To overcome a defendant's qualified immunity defense, a plaintiff must plausibly allege that (1) the official violated a federal statutory or constitutional right, and (2) the right was "clearly established" at the time of the conduct. *Moderwell v. Cuyahoga County*, 997 F.3d 653, 659–60 (6th Cir. 2021). So even after a prosecutor fails to establish absolute

immunity, the plaintiff must overcome the defendant's asserted qualified-immunity defense. *Compare Burns*, 500 U.S. at 493, *with Moderwell*, 997 F.3d at 659–60.  And here, Miller failed to meet the burden.  Miller has neither proven that violating a court order constitutes a constitutional violation, nor that such a violation is clearly established.  As a result, Craycraft is entitled to qualified immunity.  And I would affirm on that basis.[11]

---

[11]The district court did not address qualified immunity because it found that absolute immunity applied. That said, Craycraft raised qualified immunity in his motion to dismiss, though it was not the focus of his argument.