RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0161P (6th Cir.)
File Name: 03a0161p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ROBERT SPURLOCK; RONNIE
MARSHALL,
　　　　*Plaintiffs-Appellees,*

　　　　　　　No. 01-6356

*v.*

TOMMY P. THOMPSON,
　　　　*Defendant-Appellant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 00-01072—Robert L. Echols, Chief District Judge.

Argued: May 2, 2003

Decided and Filed: May 30, 2003

Before: NELSON and COLE, Circuit Judges, ROSEN,*
District Judge.

———————————

**COUNSEL**

**ARGUED:** Kimberly J. Dean, OFFICE OF THE
ATTORNEY GENERAL, Nashville, Tennessee, for
Appellant. Rick Halprin, Chicago, Illinois, for Appellees.

—————

* The Honorable Gerald E. Rosen, United States District Judge for the
Eastern District of Michigan, sitting by designation.

**ON BRIEF:** Kimberly J. Dean, Meredith DeVault, OFFICE
OF THE ATTORNEY GENERAL, Nashville, Tennessee, for
Appellant. Rick Halprin, Chicago, Illinois, for Appellees.

———————————

**OPINION**

———————————

R. GUY COLE, JR., Circuit Judge. This case arises out of
a persistent and pervasive conspiracy among law enforcement
personnel and prosecutors to convict Plaintiffs-Appellees,
Robert Spurlock and Ronnie Marshall, of murder upon the
false testimony of Henry Apple and others. Defendant-
Appellant Tommy P. Thompson, a state prosecutor, appeals
the district court's denial of his motion to dismiss Plaintiffs'
civil rights complaint on absolute immunity grounds. For the
reasons described below, we AFFIRM IN PART and
REVERSE IN PART the district court's denial of
Defendant's motion to dismiss.

## I. BACKGROUND

### A. Facts as Alleged in the Complaint[1]

The complaint of Plaintiffs Robert Spurlock and Ronnie
Marshall (the "Complaint") alleges the following. On
February 21, 1989, Lonnie Malone was found murdered in a
culvert of Bug Hollow Road in Sumner County, Tennessee.
Local law enforcement, including George Farmer and Danny
Satterfield, investigated both Spurlock and Marshall as
possible suspects in the murder. Spurlock provided an alibi,
which the officers never investigated, and Marshall admitted
being in the company of Malone on the night of the murder,
although he denied involvement in the murder. Investigators

—————

[1] Descriptions of the conspiracy may also be found in *Spurlock v.
Satterfield*, 167 F.3d 995 (6th Cir. 1999) and *State v. Spurlock*, 874
S.W.2d 602, 619-20 (Tenn. Crim. App. 1993).

did not have sufficient evidence to link Spurlock or Marshall to Malone's murder.

On April 27, 1990, Satterfield, Whitley, and Sumner County Police Officer John D. Coarsey coerced Henry "Junior" Apple, a drug dealer who was then incarcerated for failure to pay child support, into falsely implicating Spurlock and Marshall in the Malone murder. They interrogated Apple extensively, and Apple, despite initially denying any knowledge of the murder, eventually agreed to implicate Spurlock and Marshall in exchange for release from prison. The officers provided Apple with details of the murder and then recorded an interrogation of Apple in which he implicated Spurlock and Marshall in the murder, stating, in particular, that he was in Spurlock's truck when Spurlock returned with blood on his shirt.

On April 29, 1990, when the officers pressed Apple to say that he had actually witnessed the murder, rather than that he merely had knowledge of it, Apple told a jail guard that he was worried the officers would not keep their agreement to secure his release. This conversation was recorded.

On April 30, 1990, the officers recorded Apple stating that he had actually witnessed Spurlock and Marshall murder Malone, rather than merely implicating the pair as he had done in the April 27 and April 29 statements. On this recording, Apple also stated that this was the first time that he had told anyone what he had witnessed. Whitley, Coarsey, Satterfield, and Jerry R. Kitchen, an Assistant District Attorney General for Sumner County, agreed to conceal Apple's April 27 and April 29 statements.

Apple's false statements created probable cause for the arrests and prosecutions of Spurlock and Marshall. Spurlock and Marshall were only indicted after the investigating officers secured Apple's statements that he had witnessed the Malone murder. As the Tennessee Court of Criminal Appeals later noted:

The testimony of Henry Junior Apple was the sole, exclusive evidence available to the prosecution to link both Spurlock and Marshall to the murder of Lonnie Malone. Prior to Apple's revelations on April 27th, 1990 and April 30, 1990, the investigating officers could not prove that their suspects, Spurlock and Marshall, actually murdered the victim. Nor could the prosecution obtain an indictment charging the suspects with murder. The indictment in this case was returned on May 9, 1990, fifteen months and seventeen days after the commission of the murder and nine days after Apple's last statement to Detective Satterfield.

*State v. Spurlock*, 874 S.W.2d 602, 619-20 (Tenn. Crim. App. 1993).

In September and October of 1990, Apple testified falsely at the trials of Spurlock and Marshall, and both were convicted and sentenced to serve life in prison.

After the trials, defense counsel became aware of the April 27 and April 29 recordings and filed motions for a new trial. On January 8, 1992, at the hearing on the motion for new trial in Spurlock's case, Whitley called Satterfield as a witness. Satterfield testified, on cross-examination, that these two recordings of Apple were maintained at the Drug Task Force office before he took them into his own possession, and that Whitley was aware of the existence of these tapes. Plaintiffs' motions for new trial were denied. However, on May 20, 1993, the Tennessee Court of Criminal Appeals reversed the convictions, finding that Whitley knew of the April 27 and April 29 recordings and had suborned the perjury of Apple and Satterfield.

In September 1993, Thompson was appointed District Attorney General *Pro Tempore* for Sumner County, Tennessee with respect to the cases of Spurlock and Marshall. In order to cover up the conspiracy to wrongfully convict Spurlock and Marshall, Thompson agreed not to independently investigate the findings of the Tennessee Court of Criminal Appeals. In fact, on March 7, 1994, Thompson

sent a letter to an investigator for the Tennessee Board of Professional Responsibility, which had conducted an investigation into alleged prosecutorial misconduct following Plaintiffs' 1990 trial. In the letter, Thompson voiced his support of Whitley's actions, denying that Whitley had committed or had knowledge of any wrongdoing.

In 1995, Thompson re-prosecuted Plaintiffs. At Spurlock's trial, Thompson called Whitley as a witness. Whitley testified falsely. On cross-examination, Whitley testified that the failure to produce the April 27 and April 29 recordings was merely oversight because he had not realized that the recordings contained Jencks Act statements, and that the tapes had been locked up in the "Task Force office . . . from the time that they were made until the time–until some time they were disclosed to me." Apple also testified, relating the same false story he told at the first trials. Spurlock and Marshall were convicted a second time.

Plaintiffs allege that at the time of the second trial, Thompson had full knowledge of the foregoing facts or, at a minimum, access to transcripts referencing these facts. On March 6, 1996, after an investigation into the Malone murder revealed that others had confessed to the killing, Plaintiffs' second convictions were vacated.

In October 1996, Plaintiffs filed a civil rights suit, captioned *Spurlock v. Satterfield*, in federal court against Whitley, Kitchen, Coarsey, Satterfield, Apple, Sumner County, and the City of Hendersonville, alleging a conspiracy to convict Plaintiffs of murder. 167 F.3d 995.

During the course of an investigation by the Tennessee Bureau of Investigations into Apple's testimony, Apple gave a sworn statement, and later stated in an interview that he had been coerced into lying—in particular, that he was forced to testify that he had actually seen Malone's murder. In an October 26, 1996 letter responding to Apple's statement, Thompson urged investigator Ray Copeland to disbelieve Apple's statements that he had been coerced into lying.

Thompson, Whitley, and perhaps other defendants, threatened Apple that if he did not "st[i]ck to his trial story" that he would be prosecuted for perjury. In response to the complaint in Plaintiffs' first civil rights suit, Apple filed an affidavit reaffirming his trial testimony. Apple was not prosecuted for perjury.

## B. Procedural History

On November 3, 2000, Plaintiffs filed the Complaint alleging that Thompson violated certain of their federal civil rights, and also committed state law violations. Plaintiffs seek compensatory and punitive damages, as well as costs and fees.

On February 21, 2001, Thompson filed a motion to dismiss the Complaint based on a claimed entitlement to absolute prosecutorial immunity, among other things. On October 2, 2001, the district court allowed Thompson's motion to dismiss in part, but denied the motion with respect to "Plaintiff's [sic] conspiracy claims under 42 U.S.C. § 1983 based on Defendant's alleged knowing use of false testimony to secure Plaintiffs' second convictions and threatened retaliation if Henry Apple did not continue to testify falsely." The district court also concluded that Thompson was not entitled to qualified immunity for these actions. However, the district court did grant Thompson absolute prosecutorial immunity for: (1) his failure to indict Whitley for testifying falsely at the second trials of Plaintiffs, and (2) his failure to investigate the alleged misconduct of Whitley. The district court also granted Thompson "absolute witness immunity" for statements he made to the Tennessee Board of Professional Responsibility. The district court dismissed Plaintiffs' § 1981 and § 1985 conspiracy claims for failure to state a claim upon which relief may be granted. Finally, the district court denied Thompson's motion to dismiss insofar as it claimed that Plaintiffs' claims are time-barred, and granted Plaintiffs leave to re-file an amended complaint to clarify this issue.

On appeal, Thompson challenges only the district court's conclusion that he was not entitled to absolute prosecutorial

immunity with respect to Plaintiffs' claims that Thompson: knowingly used Whitley's false testimony to secure Plaintiffs' second convictions, and threatened retaliation if Apple did not maintain the truth of his false testimony after the conclusion of the second trial. We exercise jurisdiction only over the interlocutory appeal of these two issues pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

"We review the district court's denial of [a] defendant's claims that he is entitled to absolute or qualified immunity *de novo*, as that issue is a question of law." *Spurlock*, 167 F.3d at 1000 (citing *Dickerson v. McClellan*, 101 F.3d 1151, 1157 (6th Cir. 1996)). "In reviewing immunity defenses, we determine whether the facts alleged by plaintiffs, if proved, would overcome the asserted defenses." *Id.* (citing *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998)).

### A. Absolute Immunity

"[A]bsolute immunity is the exception rather than the rule, and has traditionally been reserved for those actors 'intimately associated with the judicial phase of the criminal process.'" *Id.* at 1003 (citing *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). This Court generally presumes "'that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties.'" *Id.* (quoting *Burns v. Reed*, 500 U.S. 478, 486-87 (1991)). The burden is on the official seeking protection to prove that absolute immunity is justified. *Burns*, 500 U.S. at 486.

In *Imbler*, the Supreme Court extended absolute immunity, previously available at common law, to protect prosecuting attorneys who are sued under 42 U.S.C. § 1983 for alleged deprivations of a criminal defendant's constitutional rights committed while the prosecutors were acting within the scope of their duties in initiating and pursuing criminal prosecutions. 424 U.S. at 428. The Supreme Court rejected the application of qualified immunity, finding absolute immunity justified by the "concern that harassment by

unfounded litigation [might] cause a deflection of the prosecutor's energies from his public duties, and the possibility that [the prosecutor] would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* at 423. The Court noted that the "remedial powers of the trial judge, appellate review, and state and federal post-conviction collateral remedies" are available "to determine whether an accused has received a fair trial." *Id.* at 427. In the same vein, the Court acknowledged that:

> To be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system.

*Id.* at 427-28. Of course, as the Court acknowledged, professional disciplinary actions and criminal prosecution of prosecutors are not barred by absolute immunity. *Id.* at 429.

Notably, a prosecutor will only receive absolute immunity for activities that were an "integral part of the judicial process." *Id.* at 430. Because the Supreme Court found that the activities at issue in *Imbler*, the knowing use of false testimony and the suppression of material evidence at Imbler's criminal trial, were "intimately associated" with the judicial phase of the criminal process thereby triggering absolute immunity, the Court did not address what other activities might also be "integral." 424 U.S. at 413, 430.

Since the Court's decision in *Imbler*, courts have taken a functional approach to absolute immunity. *See Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002) (looking to the "nature of the function performed, not the identity of the actor who performed it"). Using this approach, courts have concluded that a prosecutor is protected "in connection with his duties in functioning as a prosecutor." *Id.* Accordingly,

prosecutors are absolutely immune from many malicious prosecution claims. *Burns*, 500 U.S. at 485 n.4 (citing *Yaselli v. Goff*, 275 U.S. 503 (1927)). Likewise, absolute immunity is appropriate for claims based on the prosecutor's appearance at a probable cause hearing and before a grand jury. *Id.* at 487 & n.6. Absolute immunity applies to "acts . . . includ[ing] the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). Preparation of witnesses for trial is protected by absolute immunity. *Higgason*, 288 F.3d at 878 (discussing *Imbler*'s conclusion that "an out-of-court effort to control the presentation of a witness' testimony was entitled to absolute immunity because it was fairly within the prosecutor's function as an advocate" (modifications in original omitted)). As the Court concluded in *Imbler*, even the knowing presentation of false testimony at trial is protected by absolute immunity. 424 U.S. at 413, 430; *see also Buckley*, 509 U.S. at 267 n.3 (noting the Seventh Circuit's conclusion that "[p]resenting . . . fabricated evidence to the grand jury and . . . trial jury . . . [are] actions protected by absolute immunity." (citing *Buckley v. Fitzsimmons*, 919 F.2d 1230, 1243 (7th Cir. 1990))).

However, "prosecutors are not entitled to absolute immunity for 'investigative' or 'administrative' acts." *See Burns*, 500 U.S. at 483 n.2, 486; *see also Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (en banc). Thus, prosecutors are not entitled to absolute immunity for the act of giving legal advice to police. *Burns*, 500 U.S. at 496 (finding qualified immunity sufficient). Prosecutors have only qualified immunity for authorizing warrantless wiretaps in the interest of national security. *See Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985). A prosecutor is not entitled to absolute immunity for statements made in an affidavit supporting application for arrest warrant. *See Fletcher v. Kalina*, 522 U.S. 118 (1997). Similarly, out-of-court statements made by a prosecutor at a press conference are

administrative acts not entitled to absolute immunity. *Buckley*, 509 U.S. at 277-78.

As this Court has explained, "The analytical key to prosecutorial immunity, therefore, is *advocacy*--whether the actions in question are those of an advocate." *Holloway*, 220 F.3d at 775. Thus, the "critical inquiry is how closely related is the prosecutor's challenged activity to his *role as an advocate* intimately associated with the judicial phase of the criminal process." *Id.*

### B.  Knowing Use of False Testimony

Prosecutorial decisions regarding witness testimony, including what witnesses to use at trial, and what questions to ask them, are activities intimately associated with the judicial phase of a criminal trial and, therefore, are protected by absolute prosecutorial immunity. *See Imbler*, 424 U.S. at 413, 430; *Buckley*, 509 U.S. at 273. Here, as in *Imbler*, Thompson's decision, as prosecuting attorney, to have Whitley and Apple testify falsely at Spurlock's second criminal trial, even if done knowingly, is protected by absolute immunity. Thus, the district court's judgment denying Thompson absolute immunity on this claim must be reversed.[2]

### C.  Coercion and Threatened Retaliation if Apple Did Not Continue to Testify Falsely

Thompson was not acting as a legal advocate when he threatened or coerced Apple more than a year after the second criminal trial had been completed. Therefore, Thompson is not entitled to absolute immunity for this conduct. When

---

[2] Insofar as Plaintiffs argue that Thompson's act of submitting an false affidavit to the Tennessee Board of Professional Responsibility is part of their false testimony claim, we note that the district court held that Thompson is entitled to absolute witness immunity for statements that he made in affidavits to the Tennessee Board of Professional Responsibility. We do not have occasion on this appeal to revisit the district court's conclusion.

Thompson coerced Apple by threatening him to "st[i]ck to his trial story" or be prosecuted for perjury, Thompson sought to coerce Apple into maintaining the false testimony he gave during Spurlock's and Marshall's first and second criminal trials to cover up the wrongdoing of himself and others during those trials. These threats and coercion occurred after the conclusion of the adversarial proceedings relating to the second criminal prosecution of Spurlock and Marshall. Specifically, this conduct occurred during the course of an administrative investigation into the use of false testimony at Plaintiffs' trials and around the time Plaintiffs' filed their first federal civil rights suit, which implicated all those involved in the conspiracy except Thompson.

In particular, after Plaintiffs' initial convictions were vacated, Thompson re-tried Spurlock in 1995, and obtained a conviction based in significant part on the false testimony of Apple and Whitley. In 1996, after this trial and during the course of an investigation into his testimony, Apple gave a sworn statement that he had been coerced into lying on the stand at the Spurlock and Marshall trials. As a result, Thompson threatened Apple, stating that he would prosecute Apple for perjury if Apple did not maintain the truth of his trial testimony, even in light of significant evidence that Apple's testimony had been false. Plaintiffs allege that this coercion was successful, because, in response to the complaint in their October 1996 civil rights suit against Apple and others, Apple filed an affidavit reaffirming his trial testimony.

Thompson clearly acted as an advocate during the second prosecutions of Spurlock and Marshall. However, at the time of the alleged coercion and threats, those prosecutions had concluded. There were no ongoing adversarial proceedings. Absolute immunity applies to the adversarial acts of prosecutors during post-conviction proceedings, including direct appeals, habeas corpus proceedings, and parole proceedings, where the prosecutor is personally involved in the subsequent proceedings and continues his role as an advocate. *See Houston v. Partee*, 978 F.2d 362, 365-66 (7th

Cir. 1992) (citing cases and rejecting concept that absolute immunity "attaches" at trial and "then continues indefinitely"). However, where the role as advocate has not yet begun, namely prior to indictment, or where it has concluded, absolute immunity does not apply.

We find the decision of the Seventh Circuit in *Houston* analogous to the present situation. In *Houston*, after the defendants were convicted at trial and the prosecutors were no longer personally involved in the prosecution of the case, the prosecutors discovered evidence exculpating the defendants. *Id.* The Seventh Circuit held that the prosecutors' knowledge of and failure to disclose this evidence "had no connection to their 'role as advocate for the State.'" *Id.* Likewise, Thompson's role as an advocate had concluded at the time he threatened to retaliate against Apple if Apple did not maintain his false testimony.

Thus, Thompson cannot demonstrate that, in the aftermath of the second criminal trial, his actions toward Apple had the necessary connection to his role as an advocate for the State. When he threatened retaliation against Apple, Thompson was not doing so to prepare Apple as a trial witness or to make any professional evaluation of the evidence, *see Higgason*, 288 F.3d at 878, but rather to hinder the investigation into the wrongdoing of himself and others, and to defeat Plaintiffs' civil rights suit. Thompson was not required by his role as an advocate for the State to participate in the administrative investigation. Rather, during the investigation, Thompson provided information and advice to an investigative body. Functionally, a prosecutor who injects himself into a post-trial investigation into the possibility of misconduct during the trial is not acting as an advocate. Likewise, coercing a witness to maintain his false testimony during this and other proceedings does not constitute protected advocacy. Rather, Thompson's retaliatory conduct after the trial was completed is more like the administrative and investigative acts for which prosecutors have been held not to be entitled to absolute immunity. *See, e.g., Buckley*, 509 U.S. at 277-78 (holding that out-of-court statements made by a prosecutor at

a press conference are administrative acts not entitled to absolute immunity). For example, to the extent that Thompson was assisting in the administrative investigation by providing information, Thompson's conduct is clearly more like that of an investigator than that of an advocate. *See id.* at 274. "A prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Higgason*, 288 F.3d at 878. Thompson's retaliatory actions after Plaintiffs' trials had concluded were not therefore "intimately associated" with the judicial process. *Holloway*, 220 F.3d at 775 (citing *Pusey v. City of Youngstown*, 11 F.3d 652, 658 (6th Cir. 1993)).

Thompson has not pointed to any historical or common law support for extending absolute immunity to prosecutors participating in a post-trial investigation into prosecutorial and witness wrongdoing and interfering to impede discovery with respect to a post-trial civil rights complaint. Moreover, the failure to extend Thompson absolute immunity for his conduct will not interfere with any conduct intimately related to the judicial process. In fact, because no court had the power to control or restrain Thompson's out-of-court activities after the conclusion of trial, protecting Thompson's post-trial conduct in this case would impede the self-correcting nature of the judicial system. *See Houston*, 978 F.2d at 368. Specifically, conduct of the type in which Thompson allegedly engaged diminishes the likelihood of Plaintiffs' success on appeal or through post-conviction relief.

Thompson argues that, to the extent that Thompson coerced Apple into maintaining his false testimony in order to "cover up" misconduct committed by himself and others, his conduct is entitled to absolute immunity under this Court's decision in *Jones v. Shankland*, 800 F.2d 77, 80 (6th Cir. 1986). Thompson argues that this Court suggested in *Jones* that an attempt to cover up misconduct, namely a cover up of the failure to disclose exculpatory evidence, is entitled to the same absolute immunity to which the underlying act is

entitled. However, Thompson's argument misconstrues the conclusion of the *Shankland* Court.

*Shankland* involved a § 1983 complaint that alleged, without elaboration, that the defendants in that case:

[A]cted either solely or in conspiracy to infringe his First Amendment rights, failed to disclose exculpatory information, procured false testimony, failed to correct perjured testimony, caused a conflict of interest for defense counsel and then did not disclose that conflict to Jones, put a "spy" in the defense camp and "covered up" the foregoing allegedly unconstitutional actions.

*Id.* at 79. This Court decided:

The foregoing actions appear to us to be clearly within the scope of immunity contemplated by the Supreme Court in *Imbler*. The use of perjured testimony and the non-disclosure of exculpatory information are certainly entitled to absolute immunity. *See Imbler*, 424 U.S. at 431 n.34 . . . . The conflict of interest problems and the spy allegations would also seem to be related to the acts of an advocate and thus come within the area of prosecutorial immunity as do the cover up allegations which merely appear to be restatements of the prosecution's claimed failure to disclose exculpatory information.

*Id.* at 80. Thus, the *Shankland* Court concluded that the "cover up" allegations were entitled to absolute immunity because, factually, the cover up in that case was essentially a "restatement" of the plaintiff's allegation relating to the failure to disclose exculpatory evidence. *See id.*

It is this conclusion that renders *Shankland* inapposite in this case. In *Shankland*, the Court found that a cover up that took place during the criminal prosecution was part and parcel of the failure to disclose exculpatory evidence. *Id.* Here, in contrast, the allegation that Thompson threatened or coerced Apple, while undoubtedly related to the use of false testimony

at trial, is not simply a "restatement" of that claim. The cover up at issue here was not contemporaneous with the underlying wrongdoing sought to be covered up—a factor that was dispositive in *Shankland*. Moreover, the cover up here occurred after, rather than during, the criminal prosecution. Ultimately, *Shankland* does not change the fact that the alleged retaliatory conduct in this case was not intimately associated with the judicial process. Such conduct, therefore, is not entitled to absolute immunity.

Relatedly, in *Spurlock v. Satterfield*, 167 F.3d at 1001-02, this Court concluded that Danny Satterfield, one of the detectives who participated in the initial investigation of Plaintiffs and testified falsely during their prosecution, was not entitled to absolute witness immunity for his role in pressuring and coercing Apple into testifying falsely prior to trial, even though Apple's false testimony itself was covered by absolute witness immunity as was Satterfield's trial testimony. This Court concluded that "the non-testimonial acts alleged [t]here [were] akin to a situation in which a prosecutor commits unlawful acts prior to her role as an advocate, and is therefore not entitled to absolute prosecutorial immunity." *Id.* (finding absolute testimonial immunity does not "relate backwards" to protect activities engaged in by a witness prior to taking the stand). Although the issue in *Spurlock v. Satterfield* was whether a police detective was entitled to absolute witness immunity, this Court's comparison of the detective's conduct in pressuring Apple to testify falsely to a prosecutor's actions prior to acting as an advocate illuminates the situation before us. There, we essentially concluded that pressuring a witness prior to the commencement of a prosecution to testify falsely is not an act of advocacy, but rather an investigatory act. Similarly, Thompson's acts to pressure Apple to continue to testify falsely after the conclusion of the prosecution also cannot be said to be the acts of an advocate. Thompson's retaliatory conduct was not related to his prosecutorial role or duties, much less "intimately associated" with the judicial

process. We therefore hold that Thompson is not entitled to absolute immunity for these acts.[3]

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court insofar as it denied Thompson absolute immunity for coercing Apple into continuing to testify falsely, but REVERSE the judgment of the district court insofar as it denied Thompson absolute immunity with respect to the knowing use of perjured testimony of Whitley and Apple at Plaintiffs' second criminal trials. This case is REMANDED for further proceedings.

---

[3]The application of qualified immunity is not before us on appeal because Thompson failed to raise the issue in his initial brief. *See Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 153 (6th Cir. 1996). However, to the extent that absolute immunity is inappropriate for Thompson's threats and coercion of Apple after the second criminal trial, we note that, as the district court concluded, qualified immunity is likewise inappropriate. Insofar as the Complaint properly alleges a violation of Plaintiffs' right of access to the courts—a right derived from both the Due Process Clause and the First Amendment—it is clearly established that a violation of the right of access occurs if a party engages in actions that effectively cover-up evidence, thereby rendering a plaintiff's court remedy ineffective. *See Swekel v. City of River Rouge*, 119 F.3d 1259, 1262 (6th Cir. 1997). As such, any reasonable official would know Thompson's conduct was constitutionally inappropriate.