RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0205p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

LARRY SMITH,

*Plaintiff-Appellant*,

*v.*

WAYNE COUNTY, MICHIGAN; ROBERT J. DONALDSON,

*Defendants-Appellees*.

No. 24-1688

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:21-cv-12070—David M. Lawson, District Judge.

Argued: May 7, 2025

Decided and Filed: August 5, 2025

Before: THAPAR, BUSH, and LARSEN, Circuit Judges.

─────────────

**COUNSEL**

**ARGUED:** Jarrett Adams, THE LAW OFFICE OF JARRETT ADAMS, PLLC, New York, New York, for Appellant. Josephine A. DeLorenzo, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellees. **ON BRIEF:** Jarrett Adams, THE LAW OFFICE OF JARRETT ADAMS, PLLC, New York, New York, Pamela L. Campbell, RICE LAW PLLC, Eastpointe, Michigan, for Appellant. Josephine A. DeLorenzo, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellees.

─────────────

**OPINION**

─────────────

BUSH, Circuit Judge. After prosecutors agreed to have his murder conviction thrown out, Larry Smith sued Wayne County and Robert Donaldson. Smith claims that his conviction

resulted from an elaborate scheme designed by police and prosecutors to elicit false testimony from jailhouse informants to help secure criminal convictions. He alleges that Donaldson, one of the prosecutors in his case, is liable because he actively participated in eliciting false testimony from a key witness. And he maintains Wayne County is also on the hook because it had a policy or custom of encouraging the nefarious activities. The district court granted summary judgment in favor of Donaldson and Wayne County.

We **AFFIRM**. Donaldson is entitled to absolute prosecutorial immunity because Smith seeks to hold him liable for his conduct as an advocate preparing for trial. And Smith released his claim against Wayne County when he accepted a settlement under Michigan's Wrongful Imprisonment Compensation Act. Both Defendants are entitled to summary judgment.

## I.

### A.

In 1994, Kenneth Hayes was murdered in Wayne County, Michigan. Detectives in the Detroit Police Department settled on Smith and his eventual codefendant, Jay Clay, as the suspects. Smith went to trial, and a jury convicted him of first-degree murder and a firearm charge. The prosecution's case centered on the testimony of Edward Allen, a fellow county-jail inmate. Allen testified against Smith and claimed that, while incarcerated together, Smith confessed to the murder. Allen also provided key testimony linking Smith and Clay.

Smith was sentenced to life in prison without the possibility of parole, and his convictions were affirmed on direct appeal. Between 2003 and 2018, Smith filed multiple state and federal habeas petitions. He repeatedly argued that he was actually innocent, and that Allen's testimony was false. But his attempts at collateral relief were unsuccessful.

In time, Smith's case came to the attention of the Wayne County Prosecutor's Conviction Integrity Unit. The Unit's investigation uncovered evidence that Allen may have been involved in a broader scheme where Detroit Police Department detectives, in possible coordination with County prosecutors, routinely elicited false testimony from jailhouse informants to be used in criminal prosecutions. Ultimately, the Unit determined that Allen's testimony in Smith's case

may have been fabricated. Because Allen's testimony was central to the prosecution's case, the Unit asked the state trial court to vacate Smith's convictions, which it did in 2021. The Unit also concluded that "[d]ue to the passage of time," it was "not possible for the case to be re-tried." Unit Press Release, R. 102–6, PageID 3503.

**B.**

Once released, Smith filed an action in the Michigan Court of Claims seeking compensation under Michigan's Wrongful Imprisonment Compensation Act (WICA). That statute permits certain "individual[s] convicted under the law of [Michigan] and subsequently imprisoned in a state correctional facility for 1 or more crimes that he or she did not commit" to bring an action for compensation against the State. Mich. Comp. Laws § 691.1753. Ultimately, Smith reached a settlement agreement with the State. The State agreed to pay Smith $850,000 in compensation. In return, Smith "release[d] the State of Michigan of all claims, actions, causes of action, or demands which [Smith] now has or which may accrue that arise out of the consequences resulting or to result from" his 1994 conviction. Release & Settlement Agreement, R. 116–6, PageID 5058; *see also id.* ("[T]his is a release in full, and . . . Plaintiff will not be able to otherwise recover damages or monies from the State of Michigan as a result of Plaintiff's Wayne County convictions and sentences for first-degree murder and felony firearm in this matter."); *id.* at PageID 5059 ("It is further . . . agreed that [Smith] will not institute any complaint, suit, action, or cause of action, in law or in equity, against the State . . . relating to the investigation, arrest, prosecution, conviction, or imprisonment of Plaintiff."). The agreement contained a merger clause, in which the parties "agreed that there exists no promise, inducement, or agreement outside of" the agreement's text, and that the agreement "contains the entire agreement of the parties." *Id.* at 5060.

**C.**

By law, Smith's acceptance of the settlement did "not operate as a waiver of, or bar to, any action in federal court against an individual alleged to have been involved in the investigation, prosecution, or conviction that gave rise to" his conviction. Mich. Comp. Laws

§ 691.1755(8). So, Smith also filed this lawsuit against, as relevant here, Wayne County and Donaldson.

Smith brought a variety of 42 U.S.C. § 1983 claims against Donaldson for alleged constitutional violations surrounding the investigation and prosecution of Hayes's murder.[1] He claims that Detroit Police Department detectives and Wayne County prosecutors developed an elaborate scheme to produce and elicit false testimony from jailhouse informants to help secure criminal convictions. According to Smith, Allen was one such informant, and Donaldson schemed with detectives to have Allen falsely testify that Smith confessed while in pretrial detention. In return, informants, like Allen, had charges dropped or sentences reduced, were placed in better housing, and received a variety of other benefits.

Smith also brought a § 1983 *Monell* claim[2] against Wayne County. He claims the County had a policy or custom of allowing prosecutors and detectives to obtain false testimony from informants to use against criminal defendants.

After discovery, Donaldson and Wayne County moved for summary judgment. The district court granted both motions.

As to Donaldson, the court determined that the only evidence Smith produced of Donaldson's involvement in the alleged scheme were his interviews with Allen before trial. Allen claimed Donaldson enticed him in these interviews to provide false testimony at trial. But that conduct, the court held, fell within the scope of absolute prosecutorial immunity.

As to Wayne County, the court held that Smith's WICA settlement agreement operated as a release of claims against Wayne County and foreclosed all claims against it arising out of Smith's conviction. The settlement was signed by the State and did not specifically mention the County in its release provisions. But WICA states that a person who "accept[s] . . . an award under this act, or . . . a compromise or settlement of the claim" releases "all claims against this

---

[1]Smith also brought state-law claims against Donaldson for the same conduct. The district court concluded that the state and federal immunity questions rise and fall together, and, accordingly, held that official immunity also precluded Smith's state-law claims. On appeal, Smith does not challenge this conclusion (that the state and federal immunity questions run together). So, we focus on the federal claims.

[2]*Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (1978).

state."  Mich. Comp. Laws § 691.1755(8).  The Act, in turn, defines "[t]his state" to mean "the state of Michigan and its political subdivisions," which includes Wayne County.  Mich. Comp. Laws § 691.1752(e).  Putting the provisions together, the court held that by accepting the settlement, Smith released all claims against Wayne County, including his *Monell* claim.  Smith timely appealed.

## II.

On appeal, Smith challenges the grant of summary judgment to both Defendants.  We review de novo the district court's grant of summary judgment, *Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011), and will affirm if "there is no genuine dispute as to any material fact" and Defendants are entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a).  In undertaking our review, we view the facts in the light most favorable to Smith and draw all reasonable inferences in his favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Smith raises two arguments on appeal.  First, he claims the district court erred in holding that his claims against Donaldson are foreclosed by absolute prosecutorial immunity.  Second, he maintains the district court erred by granting summary judgment to the County because his *Monell* claim is not precluded by the WICA settlement.  Neither argument persuades.

## III.

We begin with whether Smith's claims against Donaldson are foreclosed by absolute prosecutorial immunity.  They are.  Absolute immunity is a narrow, but powerful, protection given to prosecutors when they act as advocates participating in or preparing for a judicial proceeding.  That protection extends to the conduct Smith seeks to hold Donaldson liable for.

## A.

The text of § 1983 does not provide any immunities from suit.  *Malley v. Briggs*, 475 U.S. 335, 342 (1986).  Rather, "[i]t purports to subject '[e]very person' acting under color of state law to liability for depriving any other person in the United States of 'rights, privileges, or immunities secured by the Constitution and laws.'"  *Burns v. Reed*, 500 U.S. 478, 484 (1991) (second alteration in original) (quoting § 1983).  But the Supreme Court has long held that

§ 1983 must be construed in light of common law principles and thus did not displace immunities that are "well grounded in history and reason." *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951); *see also Rehberg v. Paulk*, 566 U.S. 356, 361–64 (2012).

Over time, the Court has recognized a number of immunities, some more connected to historical practice than others. *See* Scott A. Keller, *Qualified and Absolute Immunity at Common Law*, 73 Stan. L. Rev. 1337, 1378–98 (2021); William Baude, *Is Qualified Immunity Lawful?*, 106 Cal. L. Rev. 45, 79–80 (2018). As a default, state actors are entitled to qualified immunity, which precludes liability unless the actor violated a clearly established constitutional right. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). But the Court has also recognized that actors performing certain functions are entitled to absolute immunity. *See, e.g.*, *Tenney*, 341 U.S. at 377, 379 (legislators); *Pierson v. Ray*, 386 U.S. 547, 553–55 (1967) (judges).

This case involves one form of absolute immunity: prosecutorial immunity. Despite its name, the immunity does not immunize a prosecutor for all of her acts. Instead, we apply a "functional approach" that provides a prosecutor with absolute immunity for her conduct insofar as it is "intimately associated with the judicial phase of the criminal process," such as when the prosecutor "initiat[es] a prosecution and . . . present[s] the State's case." *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1976). Given the many roles a prosecutor plays in the criminal justice system, the functional approach sometimes raises difficulties in determining what acts are intimately associated with the judicial phase of the criminal process. Two roles are relevant here: 1) an advocate and 2) an investigator.

"The analytical key to prosecutorial immunity . . . is *advocacy*—whether the actions in question are those of an advocate." *Holloway v. Brush*, 220 F.3d 767, 775 (6th Cir. 2000) (en banc). When a prosecutor acts as an advocate participating in a judicial proceeding, she holds absolute immunity from suit. *Imbler*, 424 U.S. at 430–31. But advocacy does not start at the courtroom door. *Id.* at 431 n.33. To serve as an advocate in the courtroom, prosecutors must engage in various preparatory activities outside the courtroom. Those acts, which include "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial," are also entitled to the protections of absolute immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *see also Imbler*, 424 U.S. at 431 n.33 ("Preparation,

both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence.").

Prosecutors also engage in investigatory functions. But only those investigatory functions that "relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings" are entitled to absolute immunity. *Buckley*, 509 U.S. at 273. "When a prosecutor performs the investigative functions normally performed by a detective or police officer," she receives only qualified immunity. *Id.* at 273, 274 n.5.

Precedent does not draw a clear line between a prosecutor's advocacy and investigatory functions. *See Genzler v. Longanbach*, 410 F.3d 630, 637 (9th Cir. 2005). As a general matter, the Supreme Court has distinguished between an "advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial," and the detective's role in searching for new evidence or witnesses. *Buckley*, 509 U.S. at 273.

**B.**

This case involves one of the more difficult functions to categorize: the interactions between prosecutors and trial witnesses post-indictment but pretrial. Interaction with witnesses is an essential part of a prosecutor's role. *See id.* at 283–84 (Kennedy, J., concurring in part & dissenting in part). She must choose who will testify, what they will testify to, and how to prepare them for cross-examination. The common intuition, then, is that such communications are shielded by absolute immunity because a prosecutor acts as an advocate preparing for trial when she prepares witnesses. *See Spurlock v. Thompson*, 330 F.3d 791, 797 (6th Cir. 2003).

But not all courts employ such an absolute rule. Some hold that a prosecutor can act as an investigator—and thereby lose her absolute immunity—by seeking out and generating evidence through new witnesses in the period between formal accusation and trial. *See, e.g.*, *Roberts v. Lau*, 90 F.4th 618, 620–30 (3d Cir. 2024); *Fogle v. Sokol*, 957 F.3d 148, 163–64 (3d Cir. 2020); *Genzler*, 410 F.3d at 637–42.

Categorizing prosecutorial interactions with witnesses can be a nuanced endeavor. Almost any attempt to prepare a witness for trial, or determine whether the witness will be

presented, will involve communications with the witness that could be framed as eliciting new testimony and thereby pegged as investigatory conduct.  At the same time, almost "all investigative activity could be considered in some sense to be" preparation for judicial proceedings.  *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998); *see also Roberts*, 90 F.4th at 626.  Why else does the government gather evidence, other than to assist its case at trial?  The net result is that, depending on the context, witness interviews could plausibly "serve either an investigative or an advocacy-related function."  *Genzler*, 410 F.3d at 638.[3]

We have yet to develop a significant dividing line in this context.  And courts take different approaches.  Some have found the line so difficult to police that they have held any interaction with a witness post-charge is advocacy conduct entitled to absolute immunity.  *See, e.g.*, *Fields v. Wharrie*, 740 F.3d 1107, 1115 (7th Cir. 2014) ("Once prosecution begins, bifurcating a prosecutor's role between investigation and prosecution is no longer feasible.").  Others draw a line between 1) the incidental development of new testimony when the prosecutor is otherwise organizing, evaluating, or marshaling evidence already gathered by law enforcement in preparation for a pending trial, and 2) prosecutors actively joining investigations and engaging in police-like activity to acquire new evidence that may then be used in the prosecution.  *See, e.g.*, *Roberts*, 90 F.4th at 622–28; *Genzler*, 410 F.3d at 639.  The first category includes a generation of evidence that is almost unavoidable in the course of conducting immunized preparatory activities.  The second requires some additional, intentional conduct on behalf of prosecutors to place themselves in investigatory roles.

Consider a few examples.  Courts often hold that prosecutors are absolutely immunized when they meet with witnesses to discuss and prepare what their testimony will be in an upcoming hearing, even if those conversations result in the development of new evidence.  *See, e.g.*, *Cousin v. Small*, 325 F.3d 627, 633–35 (5th Cir. 2003) (per curiam); *Yarris v. County of Delaware*, 465 F.3d 129, 139 (3d Cir. 2006); *Beckett v. Ford*, 384 F. App'x 435, 451 (6th Cir. 2010).  On the other hand, some hold that a prosecutor acts in a police-like investigative capacity when she actively joins an investigation to identify a new witness, plays an active role in finding

---

[3]By "plausibly," we do not imply that a plaintiff need only allege the existence of a witness interview to state a claim at the motion to dismiss stage.

that witness, and then takes the witness's initial testimony firsthand. *See, e.g.*, *Roberts*, 90 F.4th at 622–630; *Fogle*, 957 F.3d at 163–64; *Wearry v. Foster*, 33 F.4th 260, 263, 268 (5th Cir. 2022); *cf. Rieves v. Town of Smyrna*, 959 F.3d 678, 692–94 (6th Cir. 2020) (no absolute immunity where prosecutor participates in, directs, advises, and drives investigation before charges are filed). Somewhere in the middle are prosecutors who participate in witness interviews at an early stage of criminal proceedings. In one such case, the Ninth Circuit held that prosecutors acted in a police-like investigative capacity because of the timing and nature of the interviews. *Genzler*, 410 F.3d at 641–43.

## C.

Before us, the parties contest the role that the timing of the prosecutor's conduct plays in determining whether the conduct is categorized as advocacy or investigation. For its part, the district court placed significant weight on the fact "that all of the interactions occurred after the formal charges against Smith were lodged." Order, R. 123, PageID 5678. Smith, in contrast, argues that the timing of conduct is almost never relevant, as the focus should instead be on the function performed, no matter when it occurs.

The truth sits somewhere in the middle, and we take this opportunity to clarify the proper mode of analysis. The focus should always be on the function the prosecutor is performing. *See B.S. v. Somerset County*, 704 F.3d 250, 270 (3d Cir. 2013). But the conduct's timing is a relevant factor in determining whether the function is purely investigatory or taken in preparation for the prosecutor's role as an advocate. *See Cousin*, 325 F.3d at 633; *KRL v. Moore*, 384 F.3d 1105, 1111 (9th Cir. 2004); *Genzler*, 410 F.3d at 639. A few examples illustrate the point.

In *Genzler*, prosecutors interviewed a potential witness shortly after a criminal complaint had been filed. Because the prosecutors merely sought to collect the witness's recollection of events in the first instance, the court held that they acted as investigators, not advocates. 410 F.3d at 641–43. This conclusion was supported, in the court's view, by the timing of the interview, which occurred mere days after the filing of the criminal complaint and weeks before the court would decide whether probable cause supported trying the defendant. *Id.* at 633, 640–

41. That is, timing buttressed the inference that the prosecutors were still gathering evidence, not preparing for trial.

Contrast the interviewers in *Genzler* with a prosecutor who meets with a witness—who already met with law enforcement on multiple occasions—the day before a trial is set to begin. All else being equal, the timing of the meeting, when combined with the fact that the witness already met with investigators, makes it more likely that the prosecutor is preparing the witness for trial, rather than embarking on a quest for new evidence.

But conduct occurring close to trial may not always be considered advocacy if other factors suggested the conduct is investigatory. For example, in *Roberts*, the Third Circuit held that a prosecutor acted as an investigator entitled to only qualified immunity when he identified a category of evidence needed for trial, went out in the field, and joined a search for a new witness, who then testified—even though the prosecutor's conduct occurred only a month before trial. 90 F.4th at 623–25. Despite the conduct's timing, the court held that the prosecutor had "engaged in 'police investigative work'" when he "embarked on a post-charge search for a new witness to plug a hole in the prosecution's case," *id.* at 623, and therefore functioned as an investigator "seeking to generate evidence in support of a prosecution," not an advocate "interviewing witnesses as he prepare[d] for trial," *id.* at 625 (citation omitted).

The driving consideration, therefore, must always be on the activity of the prosecutor at issue. Timing may inform what the function of the activity is. But it does not control the activity's categorization. *See Price v. Montgomery County*, 72 F.4th 711, 728–29 (6th Cir. 2023) (Nalbandian, J., concurring in part & concurring in the judgment).

**D.**

Applying these principles, we conclude Donaldson acted as an advocate preparing a witness for trial, not an investigator identifying and developing evidence in the first instance. He, therefore, is entitled to absolute immunity.

**1.**

We begin by isolating the conduct that forms the basis for Smith's claims. Those claims turn exclusively on Donaldson's role in developing Allen's allegedly false testimony. Almost all of the relevant evidence comes from Allen's deposition. And his testimony shows Donaldson acted as an advocate preparing for trial.

Allen testified that he originally heard about Smith's case from his cellmate (Smith's codefendant) and the cellmate's lawyer. Then Allen *himself* reached out to police and volunteered his testimony, including the key claim that Smith confessed to the murder. Allen's own description of his involvement in Smith's case indicates that he came up with his story first, reached out to the police to make himself a witness, developed his testimony with a police detective, and then only later met with Donaldson to go over his testimony for court.

That version of events is consistent with the only other evidence in the record, a memo written by a police detective about a week before Smith's trial. The memo confirms that Allen reached out to police and was "willing to make [a] statement" regarding "Smith bragging about [the] murder." Henahan Memo, R. 116–2, PageID 4912. The memo's author then reached out to Donaldson, who asked police to collect an official statement from Allen and then "get the statement to [Donaldson] asap." *Id.* (cleaned up).

**2.**

On this record, all of Donaldson's conduct is properly characterized as that of an advocate preparing for trial. There is no evidence that Donaldson played a role in identifying Allen as a witness or even eliciting his testimony in the first instance. Instead, Allen reached out to police, and it was police who identified Allen as a witness and brought him to Donaldson's attention. There is no indication that Donaldson actively or directly joined a police investigation or engaged in police-like activity to identify new evidence that could then be used in Smith's prosecution.

Nor is there any indication that Donaldson served a police-like function in gathering Allen's testimony in the first instance. When he came to the police, Allen, by his own

admission, had already developed the basic contours of his testimony. It was a detective who initially fielded his letter, which Allen himself generated on his own accord, and then members of the police department who initially received Allen's testimony. Donaldson played no role in the effort to identify Allen or elicit his initial statement.

Instead, the only record evidence is that Donaldson served the core advocacy role of meeting with a witness the police had already identified to prepare what the witness's testimony would be in an upcoming trial. That conduct is well within an advocate's ability to engage in "an out-of-court effort to control the presentation of a witness's testimony," *Buckley*, 509 U.S. at 272–73 (cleaned up), even if it resulted in the generation of new testimony from Allen.

Finally, though not dispositive, the timing of Donaldson's conduct confirms that he was acting as an advocate preparing for trial. Donaldson interviewed Allen a mere four days before trial, in accordance with a pattern that, as Allen himself explained, prosecutors typically followed to ready witnesses for court. Given the nature of the interview, the timing of Donaldson's conduct confirms he was acting as an advocate. He is immune from Smith's claims.

**E.**

Smith raises several arguments to the contrary. None convinces.

He relies heavily on the Third Circuit's decision in *Roberts*. But there, the determinative factor was that the prosecutor had actively joined the investigation to find a new witness. 90 F.4th at 622–25. Both *Roberts* and the Third Circuit's broader caselaw distinguish between 1) a prosecutor who *himself* affirmatively searches for a new witness or actively joins an investigation to generate new evidence not yet found, and 2) a prosecutor who meets and interviews a "previously unknown witness who has been located and identified by investigators." *Id.* at 628, 630 n.11; *compare Fogle*, 957 F.3d at 163–64 (qualified immunity where prosecutor had active involvement in investigation to find new witnesses and evidence), *with Yarris*, 465 F.3d at 139 (absolute immunity where the prosecutor solicited false statements from a witness but there was no evidence the prosecutor played a role in identifying the witness or bringing him into the investigation). Here, Allen's testimony demonstrates that he made himself a witness by

contacting police and that Donaldson only became involved once police provided him with Allen's testimony.

The same is true for Smith's reliance on the Fifth Circuit's decision in *Wearry*. Like in *Roberts*, the prosecutor there was intimately involved in the identification and initial interviews of a new witness. *Wearry*, 33 F.4th at 263, 268. Smith's case, in contrast, is more similar to the Fifth Circuit's decision in *Cousin*, where the court held that a prosecutor was entitled to absolute immunity for conduct that occurred during witness meetings that were rehearsals for trial. *See* 325 F.3d at 633–35 ("[W]hen [the prosecutor] met with [the witness], he did so to tell him how he should testify in court and to rehearse his testimony with him."). Here, Allen's testimony makes clear that Donaldson was not involved in making him part of the investigation, that Allen had developed the crux of his testimony before Donaldson was involved, and that prosecutors, like Donaldson, came to the police station to prepare witnesses for their appearances in court.

Nor does it matter, as Smith claims, that Donaldson played a role in "creating" what Allen's testimony would be. *See Spurlock*, 330 F.3d at 798 (holding a prosecutor's decision to have witnesses "testify falsely" at trial, "even if done knowingly, is protected by absolute immunity"). For one, when Allen came to police, he had already developed the core of his testimony: that Smith confessed to the murder while he was Allen's cellmate. That distinguishes Smith's case from cases like *Wearry*, where prosecutors wholly concocted a witness's testimony all on their own. *See* 33 F.4th at 263–64, 267–68.[4]

What's left are refinements that Donaldson is alleged to have told Allen to make when he presented his story to the jury. But that is exactly the type of "out-of-court effort to control the presentation of a witness's testimony" that absolute immunity attaches to. *Buckley*, 509 U.S. at 272–73 (cleaned up); *see, e.g.*, *Price*, 72 F.4th at 720–22 (majority) (holding pretrial communication with a "key witness" is "plainly within the prosecutorial role," even when the communications alter the evidence presented at trial); *Spurlock*, 330 F.3d at 798; *Beckett*, 384 F. App'x at 451.

---

[4]Because Smith's out-of-circuit authorities are distinguishable, we need not decide whether the absolute immunity principles contained therein are consistent with our existing precedent.

Finally, Smith tries to reframe the facts to suggest Donaldson engaged in conduct that was investigatory. He maintains that Donaldson directed police to obtain new testimony from Allen, and therefore directed an investigation into specific evidence in a manner that would strip him of absolute immunity. *See, e.g.*, *Fogle*, 957 F.3d at 163–64. But the only evidence in the record on this point is Allen's deposition. And he testified to creating a story and then communicating it to the police. It was then the police who brought Allen to Donaldson's attention. Nor does it matter that Donaldson directed police to have Allen translate his original letter and oral statements into a written statement.[5] That is the exact type of conduct necessary for a prosecutor to obtain, review, and evaluate evidence in preparation for trial—conduct that receives absolute immunity. *See Imbler*, 424 U.S. at 431 n.33. Donaldson, therefore, is entitled to absolute immunity.

## IV.

We move next to the district court's conclusion that Smith released his *Monell* claim against the County when he accepted a settlement under Michigan's Wrongful Imprisonment Compensation Act (WICA). WICA provides that a person who accepts "settlement" of a claim under the statute releases "all claims against this state," which includes federal claims brought in federal court against counties. *See* Mich. Comp. Laws § 691.1755(8); Mich. Comp. Laws § 691.1752(e). All agree that Smith accepted a settlement under WICA. The district court concluded that, by accepting the settlement, Smith released his *Monell* claim against Wayne County.

On appeal, Smith does not dispute the district court's interpretation of WICA: that it works to bar § 1983 claims against counties in federal court when a plaintiff accepts an award or settlement under WICA. Nor does he claim that WICA's release provision is generally preempted by § 1983 or otherwise unenforceable as a matter of federal law.

---

[5]Smith claims that the memo recording this encounter demonstrates Donaldson acted as an investigator. But if anything, the memo supports Donaldson's claim that he was acting as an advocate preparing testimony for trial. It corroborates Allen's own testimony that he reached out to police to make himself a witness and volunteer testimony he already developed on his own. And its discussion of Donaldson's involvement suggests the conduct of a prosecutor who, on the eve of trial, asked the police to document evidence the police had already obtained—from a witness Donaldson played no role in identifying—so that the evidence could be used at trial.

Instead, Smith argues that the release provision is not enforceable here because his settlement agreement does not expressly refer to WICA's release provision or mention that he agreed to release claims against the County.**[6]** In other words, he claims that (presumably as a matter of federal law) statutory release provisions are enforceable only if there is a written agreement with the plaintiff expressly incorporating or acknowledging the provision and claims being released.

Our decision in *Leaman v. Ohio Department of Mental Retardation & Development Disabilities* forecloses this argument. 825 F.2d 946 (6th Cir. 1987) (en banc). That case involved the enforceability of a provision of the Ohio Court of Claims Act that released "any cause of action" a plaintiff had against a state official if the plaintiff "fil[ed] a civil action in the court of claims" based on the same subject matter. *Id.* at 948, 952 (quoting Ohio Rev. Code Ann. § 2743.02(A)(1)). The plaintiff, a former state employee, alleged through a § 1983 suit in federal court that she was terminated in violation of the First and Fourteenth Amendments. *Id.* at 948. She sued multiple defendants in her federal complaint, including a state agency and individual officers. After filing her federal complaint, she filed a virtually identical complaint in the Ohio Court of Claims against only one of the defendants. *Id.* In response, the federal district court dismissed her federal claims against all defendants. In the court's view, § 2743.02(A)(1), by operation of law, worked as a release of the plaintiff's federal claims against all state defendants the moment the state court action was filed. *Id.*

On appeal, the plaintiff contended that § 1983 preempted the Claims Act's release provision. She also argued that the state court filing could not constitute a knowing release or voluntary waiver of her federal claims against defendants who were not parties in state court.

---

**[6]**At oral argument, and for the first time in this litigation, Smith's counsel claimed that the failure to mention the County was the result of an express agreement between Smith and the State to preserve Smith's claim against the County. That alleged agreement is not mentioned in the settlement itself—which has a merger clause—and Smith points to no record evidence of the agreement. This late-breaking argument does not preclude affirmance for at least two reasons. *First*, Smith forfeited the argument by failing to raise it in the district court and in his briefs on appeal. *See Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1011 (6th Cir. 2022). *Second*, once the County raised the WICA settlement as a defense, Smith was required to introduce evidence of the alleged agreement to create a genuine dispute on the matter. *See* Fed. R. Civ. P. 56(c)(1)(A).

We rejected both arguments.  First, we held that nothing in § 1983 preempted the Claims Act's release provision or its enforceability in the ongoing federal suit.  *Leaman*, 825 F.2d at 953–56.  Second, we held that "by filing in the Ohio Court of Claims," the plaintiff "made a knowing, intelligent, and voluntary waiver of her right to bring claims against" the federal defendants who were not parties to the state court suit.  *Id.* at 956–57.  Litigants, we explained, are deemed to know the effect that their conduct may have under state law, even when that conduct releases federal claims without any express acknowledgement of waiver.  *Id.*

*Leaman*'s rationale forecloses Smith's argument that WICA's release provision is enforceable only if there is a written agreement with Smith expressly incorporating or acknowledging the provision.  *Leaman* held that the Ohio provision was enforceable against § 1983 claims even where there was no written agreement, let alone a written agreement expressly referencing the relevant provision.  *Id.* at 953–56.  It also held that a party can release § 1983 claims solely by triggering the consequences of a release statute through conduct in a separate legal proceeding, even where that conduct does not expressly mention the release of claims against the federal defendant.  *Id.* at 956–57.  Those are the exact circumstances here.  Michigan law triggered a release of Smith's claims against the County when he accepted a settlement under WICA in a separate legal proceeding.  That the release-triggering conduct did not require an express acknowledgement of the claims being released is of no moment.

*Leaman*'s waiver holding also squarely forecloses Smith's argument that the release is unenforceable because he "did not knowingly or intentionally waive his *Monell* claims against the County by signing the Release and Settlement Agreement."  Reply Br. at 12.  Like the plaintiff in *Leaman*, Smith is deemed to know the effect that his conduct—accepting a settlement under WICA—has under state law, even where that conduct releases federal claims without any express acknowledgement of the waiver.  *See* 825 F.2d at 956–57.  Because the release provision precludes Smith's claim, the district court correctly granted summary judgment to the County.

**V.**

We affirm the district court's judgment.